266 F.3d 1064 (9th Cir. 2001)
 AIR TRANSPORT ASSOCIATION OF AMERICA; AIRLINE INDUSTRIAL RELATIONS CONFERENCE; FEDERAL EXPRESS CORPORATION; UNITED AIR LINES, INC., PLAINTIFFS-APPELLANTS,
v.
CITY AND COUNTY OF SAN FRANCISCO; SAN FRANCISCO HUMAN RIGHTS COMMISSION; SAN FRANCISCO AIRPORTS COMMISSION, DEFENDANTS-APPELLEES.
 No. 99-16391
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted November 14, 2000
Filed September 11, 2001
 
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 Brendan Dolan (argued), Cecily A. Waterman, Tracy Thompson, Brobeck, Phleger & Harrison Llp, San Francisco, California, for the plaintiffs-appellants.
 Dennis Aftergut (argued), Chief Assistant City Attorney, Louise H. Renne, City Attorney, Adrienne Go, Ellen M. Foman, Joseph M. Quinn, Deputy City Attorneys, San Francisco, California; Stewart H. Foreman, Sanford Svetcov, Landels, Ripley & Diamond, Llp, San Francisco, California; G. Scott Emblidge, Moscone, Emblidge & Quadra, Llp, San Francisco, California; Therese M. Stewart, Howard, Rice, Nemerovski, Canady, Falk & Rabkin, San Francisco, California, for the defendants-appellees.
 Kevin T. Snider, Gary G. Kreep, William G. Gillespie, Escondido, California, for amicus curiae United States Justice Foundation, in support of the plaintiffs-appellants.
 Matthew A. Coles, New York, New York, for the amicus curiae American Civil Liberties Union Foundation, Inc.; Robert Kim, San Francisco, California, for amicus curiae American Civil Liberties Union Foundation of Northern California; Jennifer C. Pizer, Los Angeles, California, for amicus curiae Lambda Legal Defense & Education Fund, in support of the defendants-appellees.
 Appeal from the United States District Court for the Northern District of California Claudia Wilken, District Judge, Presiding. D.C. No. CV-97-01763-CW
 Before: J. Clifford Wallace, Raymond C. Fisher and Johnnie B. Rawlinson, Circuit Judges.
 
 
 1
 Opinion by Judge Fisher; Dissent by Judge Wallace
 
 Fisher, Circuit Judge
 
 2
 The Air Transport Association of America, Airline Industrial Relations Conference, Federal Express Corporation, and United Air Lines, Inc. (together, "Airlines") appeal from a summary judgment in favor of the City and County of San Francisco ("City"). The Airlines argue that Chapter 12B of the San Francisco Administrative Code ("Ordinance") is preempted by the Airline Deregulation Act, the Railway Labor Act and California law. The Ordinance conditions all City contracts, including airport property lease agreements, on the contractor's promise not to discriminate on the basis of race, color, creed, religion, national origin, ancestry, age, sex, sexual orientation, gender identity, disability, HIV/AIDS status, domestic partner status or marital status. This promise not to discriminate also extends to the provision of employment benefits to the domestic partners of employees, either married or registered with a government entity. The district court had jurisdiction under 28 U.S.C. §§ 1331. We have jurisdiction pursuant to 28 U.S.C. §§ 1291. We affirm.
 
 I.
 
 3
 The City, through its Airport Commission, owns and operates the San Francisco International Airport ("Airport" or "SFO"), which is located outside the City's territorial jurisdiction in San Mateo County. The Air Transport Association of America ("ATA") is the principal trade organization for airlines based in the United States. In 1997, 16 of its members operated routes to and from the Airport, including appellants United Air Lines, Inc. ("United") and Federal Express Corporation ("FedEx"). The Airline Industrial Relations Conference ("AIRCON") is another airline trade organization. United is the largest carrier at the Airport, occupying 43 gates and paying more than $40 million annually in rent and fees to the City. FedEx is one of the nation's largest cargo carriers and also has extensive operations at the Airport. To facilitate their transportation and cargo service at the Airport, the Airlines, or their members, contract with the City for terminal space, hangars and other aircraft facilities, and landing gate permits.
 
 
 4
 Since 1966, the City has refused, as a matter of public policy, to do business with contractors that discriminate on the basis of race and other identifying factors. See Ch.12B S.F. Admin. Code; Alioto's Fish Co., Ltd. v. Human Rights Comm'n of San Francisco, 120 Cal. App.3d 594, 600 & n.4 (1981). In 1972, the City amended Chapter 12B to add gender and sexual orientation as additional prohibited bases for discrimination; in 1974 and 1977 age and disability were added. See id. Since at least 1981, the City has required the Airlines to comply with this ordinance and has expressly conditioned its Airport leases on a promise by the Airlines not to discriminate on the basis of race, gender, disability, sexual orientation and other factors.
 
 
 5
 In 1997, the City amended Chapter 12B and added the following provision:
 
 
 6
 No contracting agency of the City, or any department thereof, acting for or on behalf of the City and County, shall execute or amend any contract or property contract with any contractor that discriminates in the provision of bereavement leave, family medical leave, health benefits, membership or membership discounts, moving expenses, pension and retirement benefits or travel benefits as well as any [other] benefits . . . between employees with domestic partners and employees with spouses, and/or between the domestic partners and spouses of such employees, where the domestic partnership has been registered with a governmental entity pursuant to state or local law authorizing such registration . .. .
 
 
 7
 Ordinance §§ 12B.1(b). These requirements extend to "a contractor's operations on real property outside of San Francisco owned by the City," including the Airport. Id. at §§ 12B.1(d)(ii). Thus, in order to execute new airport property contracts or to amend existing airport property contracts, the Airlines must provide benefits on an equal basis to married employees and employees with registered domestic partners. They can do this by either extending benefits to employees' domestic partners or by contracting benefits to employees' spouses.
 
 
 8
 ATA and AIRCON filed suit, alleging that the Ordinance was preempted by the Airline Deregulation Act ("ADA"), the Railway Labor Act ("RLA"), the Employee Retirement Income Security Act of 1974 ("ERISA"), and California law. They also alleged that the Ordinance violated the Commerce Clause, the Due Process Clause, and the San Francisco City Charter. On cross-motions for summary judgment, the district court held (1) that the Ordinance "as applied to Airport contracts is entirely preempted insofar as it affects ERISA plans providing ERISA benefits," Air Transport Ass'n of Am. v. City & County of S.F., 992 F. Supp. 1149, 1180 (N.D. Cal. 1998), and (2) that a provision requiring contractors to abide by the Ordinance at "any of a contractor's operations elsewhere within the United States," Ordinance §§ 12B.1(d)(iv), violated the Commerce Clause "as applied to out-of-State conduct that is unrelated to the purpose of a City contract." Air Transport Ass'n, 992 F. Supp. at 1155. The City has not appealed these rulings. The district court also held the Ordinance was not preempted by the RLA because it provided minimum labor standards and did not encourage or discourage collective bargaining. Id. at 1190. It further concluded that the regulations the City promulgated under the Ordinance were not in conflict with the RLA. Id. at 1191.
 
 
 9
 The district court determined that it was necessary to take more evidence before resolving whether the Ordinance was preempted by the route provision of the ADA. Id. at 1187. The district judge did, however, hold that the proprietary powers exception to the ADA would not exempt the Ordinance from preemption; the City has not appealed that decision. Id. at 1188. The district court upheld the Ordinance in all other respects. Id. at 1155. United and FedEx then intervened as plaintiffs. On May 27, 1999, the district court disposed of the remaining ADA issue in favor of the City. It held that under the ADA preemption provision, the Airlines were required, and had failed, to provide proof that"they, or the members they represent, are seriously considering not flying in or out of San Francisco, or limiting or rejecting future business or expansion, as a result of the burdens of complying with the Ordinance." We denied injunctive relief pending appeal.
 
 II.
 
 10
 The ADA provides that state and local governments "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. §§ 41713(b)(1). The Airlines make two arguments as to why the Ordinance is preempted. Their first argument is that the Ordinance's requirement that contractors not discriminate in providing "travel benefits" and "employee discounts " relates to prices and services. Their second argument is that the Ordinance's method of imposing the nondiscrimination requirements--conditioning future airport property leases on compliance with the Ordinance--relates to service and routes. The district court granted summary judgment in favor of the City, holding there was no preemption. We review de novo the district court's entry of summary judgment and its decision regarding preemption. Espinal v. Northwest Airlines, 90 F.3d 1452, 1455 (9th Cir. 1996).
 
 
 11
 In determining the scope of ADA preemption, we "start with the assumption that the historic police powers of the States [are] not to be superseded by the [ADA] unless that was the clear and manifest purpose of Congress" and that "Congress does not cavalierly pre-empt state-law causes of action." Charas v. Trans World Airlines, Inc. , 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc) (internal quotation marks omitted). "Congress's `clear and manifest purpose' in enacting the ADA was to achieve . . . the economic deregulation of the airline industry. Specifically, `the ADA . . . was designed to promote maximum reliance on competitive market forces.' " Id. (quoting Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 230 (1995)) (second omission in original; internal quotation omitted). "The purpose of preemption is to avoid state interference with federal deregulation. Nothing in the Act itself, or its legislative history, indicates that Congress had a`clear and manifest purpose' to displace state [laws] in actions that do not affect deregulation in more than a `peripheral manner.' " Charas, 160 F.3d at 1265 (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 390 (1992)).
 
 
 12
 The Supreme Court has held that the analytical framework used in ERISA preemption cases is also utilized in assessing the effect of the ADA's preemption provision on a particular state or local law. Morales, 504 U.S. at 384 ("Since the relevant language of the ADA is identical [to that of ERISA's preemption provision], we think it appropriate to adopt the same standard . . . ." ). Thus, a state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. Wolens, 513 U.S. at 223 (internal quotation marks omitted). We have held that the terms "price," "route" and"service" were used by Congress in the public utility sense; that is,"service . . . refers to such things as the frequency and scheduling of transportation, and to the selection of markets to or from which transportation is provided." Charas, 160 F.3d at 1265-66. "Airlines' `rates' and `routes' generally refer to the point-to-point transport of passengers. `Rates' indicates price; `routes' refers to courses of travel." Id. at 1265.
 
 
 13
 Preemption resulting from "reference to" price, route or service occurs "[w]here a State's law acts immediately and exclusively upon [price, route or service] . .. or where the existence of [a price, route or service] is essential to the law's operation." Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997); see also Morales, 504 U.S. at 388. The Supreme Court has held as preempted under this test a law that imposed requirements by reference to ERISA covered programs, a law that specifically exempted ERISA plans from an otherwise generally applicable law and a common-law cause of action that was premised upon an ERISA plan. Dillingham, 519 U.S. at 324 (citing District of Columbia v. Greater Wash. Bd. of Trade, 506 U.S. 125, 130-31 (1992); Ingersoll-Rand Co. v. McLendon, 498 U.S. 133, 140 (1990); Mackey v. Lanier Collection Agency & Serv., Inc., 486 U.S. 825, 828 n.2, 829-30 (1988)).
 
 
 14
 Under the ADA, the Supreme Court held as preempted state laws regulating the manner in which airlines advertise airfares and requiring that the fares be available in sufficient quantities to meet reasonably foreseeable demands. Morales, 504 U.S. at 387-88. These laws required airlines to make various disclosures in their advertisements and that advertised prices include all taxes and surcharges. Id. at 387. The Court concluded these restrictions had a specific textual"reference to" airfares and therefore impermissibly related to prices. Id. at 388.
 
 
 15
 To determine whether a local law has a prohibited "connection with" a price, route or service, "we look both to the objectives of the [ADA] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on[price, route or service]." Dillingham, 519 U.S. at 325 (internal quotation marks and citations omitted). If a state law's effect on price, route or service is "too tenuous, remote, or peripheral," then the state law is not preempted. Morales, 504 U.S. at 390 (internal quotation marks omitted). Recent Supreme Court ERISA cases suggest that in order for the "effect " of a state law to cause preemption, the state law must compel or bind an ERISA plan administrator to a particular course of action with respect to the ERISA plan. See Egelhoff v. Egelhoff, 121 S.Ct. 1322, 1327 (2001) ("The statute binds ERISA plan administrators to a particular choice of rules for determining beneficiary status." (emphasis added)); Dillingham, 519 U.S. at 333 ("[I]t has not been demonstrated here that the added inducement created by the wage break available on state public works projects is tantamount to a compulsion upon apprenticeship programs." (emphasis added)); N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 664 (1995) ("Although . . . there might be a point at which an exorbitant tax leaving consumers with a Hobson's choice would be treated as imposing a substantive mandate, no showing has been made here that the surcharges are so prohibitive as to force all health insurance consumers to contract with the Blues."); see also Dishman v. Unum Life Ins. Co., 250 F.3d 1272, 1277-81 (9th Cir. 2001). By analogy, a local law will have a prohibited connection with a price, route or service if the law binds the air carrier to a particular price, route or service and thereby interferes with competitive market forces within the air carrier industry.
 
 
 16
 A. The Ordinance's requirement that contractors not discriminate in the provision of "travel benefits" and "employee discounts" does not relate to prices or services.
 
 
 17
 The Airlines argue that the Ordinance's requirement that city contractors not discriminate in their provision of "travel benefits" and "employee discounts" has both a reference to and a connection with prices and service rendering the Ordinance preempted. Some of the Airlines allow family members of their employees to travel on the airline at discounted rates if seats are available. They argue that by expanding this group to include registered domestic partners, the City is dictating the Airlines' ability to set prices and access to flights for this group.
 
 
 18
 The Ordinance's mention of "travel benefits" and "employees discounts" is not a reference to airfares or the frequency and scheduling of transportation or the selection of markets to or from which transportation is provided. See Charas, 160 F.3d at 1265-66. The Airlines' arguments are premised on the notion that the Ordinance was written with the airline industry in mind. This is not so. The Ordinance is a broad law applying to hundreds of different industries ranging from the maintenance of electrical transformers to public art displays. It is not focused upon air carriers. The Ordinance's mention of "travel benefits" refers to an employment benefit (e.g., allowing an employee's spouse or partner to travel with him or her on business). It is not a reference to airlines' prices or services. Similarly, "employee discounts" is not a reference to plane ticket prices; it is a broad reference to an unlimited number of items (e.g., amusement park tickets, merchandise, rental cars, etc.).
 
 
 19
 The requirement that airlines not discriminate in providing benefits also has no forbidden connection with prices and services. The Ordinance simply requires that the Airlines not discriminate in their provision of benefits. It does not bind the Airlines to provide free or discounted tickets to anyone. If the Airlines do provide tickets to employees' spouses, however, then they must also provide them to their registered domestic partners. The Airlines are free to set whatever terms, conditions and prices they want on the travel benefits and discounts they do decide to provide, as long as they do not discriminate. In that regard, the Ordinance is no different from other non-discrimination laws that we have held were not preempted by the ADA. See Newman v. Am. Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir. 1999) (holding California law barring physical disability discrimination is not preempted by the ADA); Aloha Islandair Inc. v. Tseu, 128 F.3d 1301, 1303 (9th Cir. 1997) (holding Hawaii law barring physical disability discrimination is not preempted by the ADA); see also Abdu-Brisson v. Delta Air Lines, Inc., 128 F.3d 77, 84 (2d Cir. 1997) (holding New York law barring age discrimination was not preempted by the ADA). There is no indication that when Congress passed the ADA, it intended to preempt states and local governments from passing laws that forbid employers from discriminating in their provision of employment benefits.
 
 
 20
 B. The City's use of its bargaining power over the Airlines is not preempted by the ADA.
 
 
 21
 In the district court, the Airlines argued that the increased cost of providing benefits to their employees' domestic partners would force the Airlines to change their routes and services; specifically, they argued that the cost of the Ordinance would force them to stop flying out of SFO. The district court disagreed, finding no evidence that the Ordinance coerced or compelled the Airlines to change any of their routes or services. The Airlines have abandoned this argument on appeal.
 
 
 22
 Now, the Airlines argue that they cannot change their routes and services out of SFO regardless of the costs associated with the Ordinance "because of competitive demands and the economic commitments made to respond to those demands." They point out by way of example that United employs 17,000 people at SFO, operates over 500 daily flights and has invested tens of millions of dollars in facilities. They argue that because of this economic situation, the City has extreme bargaining power and leverage over the Airlines and can force them to accept the Ordinance's nondiscrimination provisions in the Airport leases. This, they contend, is preempted by the ADA under both the reference-to and connection-with tests.
 
 
 23
 The Airlines first argue that the Ordinance has a"reference to services and routes because the City's leverage over airport access is the essential means by which it operates. " The test for preemption is not whether "leverage" is essential to the state or local law, however, but rather whether prices, routes and services are essential. We conclude that the existence of airlines' "routes and services" is neither essential nor even relevant to the Ordinance's operation. The Ordinance applies to the majority of City contractors in countless industries. It operates by adding a contractual requirement prohibiting contractors from discriminating on the basis of race, gender, disability, age, marital status and other factors. Whether or not some of those contractors are airlines and those airlines have choices to make in their routes and services is not essential to the Ordinance's application. Cf. Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, 140 (1990) (holding that cause of action that depended upon the existence of an ERISA plan was preempted).[1] For example, San Francisco, through the Ordinance, is able to forbid discrimination by companies that maintain its electrical transformers despite the fact that these companies have no connection with the airport whatsoever. See S.D. Myers, Inc. v. City and County of San Francisco, 253 F.3d 461, 466 (9th Cir. 2001).
 
 
 24
 Second, the Airlines argue there is a forbidden connection with routes and services because, if the Airlines do not comply with the nondiscrimination requirements, they will not be leased property at SFO. Again the Airlines misframe the question. The question is not whether the Ordinance compels or binds them into not discriminating; the question is whether the Ordinance compels or binds them to a particular price, route or service. See Egelhoff, 121 S.Ct. at 1327. The Airlines now concede that they will lease airport property in San Francisco regardless of the Ordinance. Accordingly, the Ordinance cannot be said to compel or bind the Airlines to a particular route or service and there is no preemption under the connection-with test.
 
 
 25
 What the Airlines are truly complaining about are free market forces and their own competitive decisions. Whatever leverage the City has in its negotiations over the Airlines is created by the market conditions that were allowed to blossom through the passage of the ADA. The ADA allows air carriers to make their own decisions about where to fly and how many resources to devote to each route and service. In this deregulated environment, airlines can decide whether or not to make large economic investments at the San Francisco airport. Now, as the Airlines claim, "because of competitive demands and the economic commitments made to respond to those demands," they are committed to staying at San Francisco. That economic decision may mean the Airlines will have to agree to abide by the Ordinance's nondiscrimination requirements as a "cost" of maintaining their leases at SFO. That San Francisco may have bargaining power because of the Airlines' competitive decisions does not, however, thereby disable San Francisco from enforcing its nondiscrimination Ordinance; it is not using that power to force the Airlines to adopt or change their prices, routes or services -the prerequisite for ADA preemption.
 
 
 26
 The Airlines' argument, adopted by the dissent, that the Ordinance amounts to an impermissible ultimatum, a Hobson's choice -either leave the Airport or do not discriminate -proves too much. In effect, the Airlines are arguing that because SFO is critical to their business operations, San Francisco cannot apply its generally applicable nondiscrimination Ordinance to them; their dependence on SFO insulates them from the law. Of course, their choice is not so simplistic, nor so Hobsonian, and the ADA does not confer such a privileged immunity.
 
 
 27
 Simply put, the Airlines take many factors into consideration when choosing their routes and services, including the costs of complying with regulatory requirements such as the Ordinance. As the District Court found after hearing the Airlines' evidence and arguments about how they choose routes and services, the Airlines' costs of complying with the Ordinance are not a significant factor in the Airlines' decisions regarding routes and services at SFO. That finding is firmly supported by the record.
 
 
 28
 Indeed, the costs of providing the domestic partner employment benefits at issue here -the only costs the Airlines complained about -are a small, if not inconsequential, fraction of the Airlines' costs of flying through SFO. Given the limiting rulings by the district court unchallenged on appeal, the Ordinance applies only to the provision of non-ERISA benefits -e.g., bereavement leave, family medical leave and travel benefits. The Airlines could comply with the Ordinance's requirements by reducing or eliminating these benefits altogether, thereby avoiding any additional costs. Moreover, some of the plaintiffs have actually begun extending employment benefits to their employees' domestic partners on a nationwide basis during the pendency of this appeal, even though they were not obligated to do so under the Ordinance. This further evidences that the costs of providing these benefits are not enough to compel the Airlines to change their routes and services.[2] See Duncan, 208 F.3d at 1115. Hypothetically, there might be some contract term the City could demand whose costs would be so high that it would compel the Airlines to change their prices, routes or services. Cf. Travelers Ins., 514 U.S. at 655 (stating in dictum that there may be a point at which costs from a state law are so exorbitant that it could rise to the level of a substantive mandate). The nondiscrimination provisions at issue here, however, do not approach that level. See Duncan, 208 F.3d at 1115 (holding additional costs imposed by exposing Northwest Airlines to liability from smoking lawsuits was not enough to compel Northwest to change its services).
 
 
 29
 Last, the Airlines contend that the City should not be able to impose the Ordinance through its role as landlord at the Airport. We find this argument unavailing. Regardless of whether a sovereign uses its police power or its contractual power to impose restrictions, we apply the same preemption analysis.[3] See Egelhoff, 121 S.Ct. at 1327-30 (applying reference to and connection with preemption tests to law imposed under Washington's police powers); Dillingham , 519 U.S. at 325-334 (applying reference to and connection with preemption tests to law that applies only to those who contract with the state of California and whose provisions are expressly integrated into the contract); Californians for Safe & Competitive Dump Truck Transp. v. Mendonca, 152 F.3d 1184, 1188-89 (9th Cir. 1998) (same). Under that analysis, we conclude the Ordinance is not preempted.
 
 III.
 
 30
 The Railway Labor Act ("RLA"), which was extended in 1936 to cover the airline industry, is similar to the National Labor Relations Act ("NLRA") in that it regulates the process of negotiations for the creation and modification of collective bargaining agreements ("CBAs"). The RLA imposes a duty on employers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions . . . ." 45 U.S.C.§§ 152. The RLA is also similar to the Labor Management Relations Act ("LMRA") in that it creates a system for dispute resolution for grievances arising from CBAs. The RLA establishes a mandatory arbitral mechanism to handle disputes "growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. §§ 153(i).
 
 
 31
 Unlike the ADA, the RLA does not contain any express preemption language. The courts, however, have interpreted the RLA to preempt state laws and lawsuits in at least three situations.[4] First, state laws prohibiting collective bargaining altogether by railway and airline employees are preempted because they directly conflict with the RLA's express allowance of collective bargaining. See California v. Taylor, 353 U.S. 553, 559-561 (1957) (holding preempted a California law that forbade collective bargaining by the employees of the state-owned railroad).
 
 
 32
 Second, state law causes of action that depend upon the interpretation of CBAs are preempted because the interpretation or application of existing labor agreements are the exclusive jurisdiction of the arbitrational bodies created by the RLA. See Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 252-253 (1994); Espinal v. Northwest Airlines , 90 F.3d 1452 (9th Cir. 1996). Claims or causes of action involving rights and obligations that are independent of the CBA are not preempted. Norris, 512 U.S. at 256 (holding employee's whistle-blower claim was not preempted by the RLA); see also Espinal, 90 F.3d at 1459 (holding that employee's state law discrimination claims were not preempted by the RLA, but breach of contract claims were). This type of preemption is analogous to preemption under §§ 301 of the LMRA, 29 U.S.C. §§ 185. See Espinal, 90 F.3d at 1456 ("To determine whether the claim is preempted by the RLA, courts should apply the preemption test used in cases under the[LMRA].").
 
 
 33
 Third, state laws that frustrate the purpose of the RLA are preempted. For example, in Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co., 394 U.S. 369 (1969), the Supreme Court held that a state court could not enjoin a union from picketing a railroad where that union was involved in a dispute governed by the RLA. The Court stated that the RLA allowed unions to resort to self-help mechanisms (e.g., strikes) while involved in a labor dispute that is governed by the RLA arbitration process. See id. at 378-79. The Court held that state law interference with union members' ability to strike would frustrate the Act's purpose and thus the state was preempted from acting. See id. at 380. This type of preemption is analogous to Machinists preemption under the NLRA. See Lodge 76, Int'l Assoc. of Machinists v. Wisconsin Employment Relations Comm'n, 427 U.S. 132, 147-48 (1976) (citing Jacksonville Terminal as precedent for its holding that state and municipalities are preempted by the NLRA from regulating those areas that have been left by Congress to be controlled by the free play of economic forces).
 
 
 34
 The RLA, however, does not preempt state or local efforts to prevent discrimination or set minimal substantive requirements on contract terms. Norris, 512 U.S. at 257; Colorado Anti-Discrimination Comm'n v. Continental Air Lines, Inc., 372 U.S. 714, 724 (1963); Terminal R.R. Ass'n of St. Louis v. Bhd. of R.R. Trainmen, 318 U.S. 1, 6 (1943); see also Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985). In Terminal Railroad, the Supreme Court held that an Illinois requirement that railroads provide cabooses was not preempted by the RLA.
 
 
 35
 State laws have long regulated a great variety of conditions in transportation and industry . . . . Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. . . . [I]t cannot be that the minimum requirements laid down by state authority are all set aside. We hold that the enactment by Congress of the Railway Labor Act was not a pre-emption of the field of regulating working conditions themselves.
 
 
 36
 Id. at 6-7 (emphasis added).
 
 
 37
 Likewise, in Colorado Anti-Discrimination Comm'n , the Supreme Court held a Colorado law that barred racial discrimination in the hiring of airline pilots was not preempted by the RLA. The Court held there was nothing implied or express in the RLA that would bar state legislation to protect employees from racial discrimination. 372 U.S. at 724. Similarly, under the NLRA, the Supreme Court and this Circuit have held that laws setting minimum health benefits, minimum severance payments, prevailing wages and providing workers' compensation coverage were not preempted.[5] See Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 22 (1987) (holding NLRA did not preempt a state law that requires minimum severance payments when a factory closes); Metropolitan Life Ins., 471 U.S. at 758 (holding NLRA did not preempt Massachusetts law that set minimum health care benefits); Dillingham Const., 190 F.3d at 1039-40 (holding NLRA did not preempt California law that required public works employers to pay prevailing wages to apprentices); Contract Services Network v. Aubry, 62 F.3d 294, 298-99 (9th Cir. 1995) (holding NLRA did not preempt California law that required employers to contribute to unemployment and workers' compensation funds).
 
 
 38
 The Airlines argue that the Ordinance is preempted because it would frustrate the RLA's purpose. They contend the Ordinance interferes with the collective bargaining process and disrupts the Airlines' ability to set a nationwide benefits policy for their employees. Specifically, they contend that the Ordinance's requirement that they not discriminate in their provision of benefits means that the Airlines have to include these changes in their CBAs and are forced to go to the bargaining table with their employees' unions. They argue that not all unions may be willing to accept the nondiscrimination requirements the Ordinance mandates and there may be ensuing labor strife. Further, they contend that due to the structure of the current CBAs and the industry, they will not be able to limit their new nondiscriminatory benefits policy to their San Francisco employees. They will be forced to provide equal benefits to all of the registered domestic partners of their employees.
 
 
 39
 We conclude that the Ordinance's requirement that contractors not discriminate in their provision of benefits is akin to a minimum labor standard or an antidiscrimination law and is not preempted by the RLA. The Ordinance has features that make it similar to both the antidiscrimination law in Colorado Anti-Discrimination Comm'n and the minimum benefits provisions in Metropolitan Life Ins. As in both cases, the Ordinance applies to union and nonunion employees alike and neither favors nor discourages collective bargaining. Like the law in Colorado Anti-Discrimination Comm'n , the Ordinance requires employers to treat certain groups of people equally. Like the law in Metropolitan Life Ins. , the Ordinance deals with the provision of employee benefits. Instead of providing a static requirement of what those benefits must be (e.g., mental health coverage), it has a dynamic requirement -equivalent to the benefits that are given to employees' spouses. "Because minimum labor standards do not affect the collective bargaining process, minimum labor standards do not affect or regulate the right to bargain collectively." Dillingham, 190 F.3d at 1040. Further Congress did not intend the RLA to prevent states and municipalities from prohibiting discrimination. See Colorado Anti-Discrimination Comm'n, 372 U.S. at 724. Accordingly, we hold that the Ordinance is not preempted by the RLA.
 
 
 40
 That the Airlines may have to negotiate with the various unions representing their employees to change the benefits policy is not in conflict with the RLA. A consequence of the states' ability to set minimum standards and prevent discrimination is that employers and unions may face different requirements in different jurisdictions. In some instances, a new state or local law will cause employers and unions to go back to the bargaining table when a current CBA does not comply with the law. This is not at odds with the purpose of the RLA, however. The RLA envisions employers and unions bargaining in the backdrop of the various federal and state regulations in existence. See Metropolitan Life Ins., 471 U.S. at 757. It sets up a process for that bargaining and a means for resolving disputes. It does not create a national policy for uniformity in employee benefits, nor does it prevent state or local laws that make illegal terms of current or future CBAs that discriminate or fail to provide minimum benefits or protections. The fact that the Airlines may have to go back to the bargaining table or include new provisions in their CBAs to comply with the Ordinance does not frustrate the purpose of the RLA.
 
 
 41
 The Airlines also argue that the City's regulations addressing how contractors who have entered into CBAs must negotiate with their unions to comply with the Ordinance is in conflict with the RLA and therefore preempted. See HUMAN RIGHTS COMMISSION RULES OF PROCEDURE FOR THE NONDISCRIMINATION IN CONTRACTS, Ch.12B S.F. Admin. Code. We do not address the Airlines' arguments regarding the regulations because their First Amended Complaint only challenges the Ordinance on its face. The regulations have no bearing on whether the Ordinance on its face is preempted, because it is possible that the City can change the regulations or apply them in a manner consistent with the RLA.[6]
 
 IV.
 
 42
 Article 11, section 7 of the California constitution provides, "A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." A charter city, like San Francisco, may "make and enforce all ordinances and regulations in respect to municipal affairs . . . [I]n respect to other matters they shall be subject to general laws." C AL. CONST. art. 11, §§ 5. The Airlines argue that the recently enacted California Family Code (Family Code) §§ 299.6 is a general law conflicting with, and thereby preempting, the Ordinance.
 
 
 43
 Family Code §§ 299.6 was not signed into law until October 2, 1999, after the district court had already ruled on the Airlines' claims. Thus, this issue is raised for the first time on appeal. Generally, we will not consider such arguments. S.D. Myers, 253 F.3d at 473; United States v. Carlson, 900 F.2d 1346, 1349 (9th Cir. 1990). We remand to the district court to decide this limited issue. S.D. Myers, 253 F.3d at 473.
 
 CONCLUSION
 
 44
 For the foregoing reasons we hold that the Ordinance is not preempted by the ADA or the RLA. We remand to the district court the limited issue of whether the Ordinance is preempted by Cal. Family Code §§ 299.6.
 
 
 45
 AFFIRMED, REMANDED IN PART.
 
 
 
 Notes:
 
 
 [1]
 In Ingersoll-Rand, the Court held a state common law claim that an employee was wrongfully discharged to prevent his attainment of benefits under an ERISA plan was preempted by ERISA, concluding that the existence of the plan itself was a critical element of the cause of action -no plan, no cause of action. 498 U.S. at 139-140. The dissent attempts to liken San Francisco's nondiscrimination Ordinance to the Texas cause of action, asserting that "there would be no effective application of the Ordinance to the Airlines but for the City's monopoly control over necessary transportation services and routes located at the Airport." This formulation, however, confuses the essence of the test and the Ordinance: The City does not depend upon its contractors needing routes and services for the application of the Ordinance. The Ordinance deals only with nondiscrimination in benefits, regardless of the nature of the employer's business.
 
 
 [2]
 Notably, the Airlines have lived with Chapter 12B's other nondiscrimination provisions in its Airport leases for nearly 20 years without claiming those provisions were preempted by the ADA.
 
 
 [3]
 The dissent's hypothesis that"If the Airlines had refused to comply with the Ordinance and the City were before us attempting to evict the Airlines from the Airport, it would be clear that such an action would be preempted by the Act," is not clear at all. The Ordinance applies only to new or amended contracts. The only way the Airlines could be subject to eviction is if their old leases expired and they failed to enter into new leases or they entered into new leases and then breached those leases. In either case, we would still apply the same preemption analysis and determine whether complying with the Ordinance's nondiscrimination requirements compelled the Airlines to adopt certain prices, routes or services.
 
 
 [4]
 For purposes of this appeal, we will assume without deciding that the Ordinance is a form of regulation. The RLA would not preempt actions taken by the City as a proprietor or market participant. Cf. Dillingham Const. N.A., Inc. v. County of Sonoma, 190 F.3d 1034, 1037 (9th Cir. 1999) (holding that under the NLRA, there is no preemption of state actions taken as a proprietor or market participant).
 
 
 [5]
 NLRA precedent is relevant to this type of RLA preemption because the two laws treat the issue of whether minimum labor standards are preempted the same. See Metropolitan Life Ins., 471 U.S. at 757 n.32 (stating that the Supreme Court has already addressed the issue of whether minimum labor standards are preempted under the RLA citing specifically to Terminal R.R., 318 U.S. at 6-7).
 
 
 [6]
 We offer no opinion as to whether the current regulations are in conflict with or preempted by the RLA.
 
 
 WALLACE, Circuit Judge, dissenting:
 
 46
 I respectfully disagree with the majority's analysis in Part II.B, in which the majority holds that the City and County of San Francisco (City) may, consistent with the Airline Deregulation Act (Act), use its monopoly over property at the San Francisco International Airport (Airport) to compel the Airlines to provide benefits on an equal basis to their employees. Because I believe that the Act preempts the City's use of its monopoly power to enforce Chapter 12B of the San Francisco Administrative Code (Ordinance), I would reverse the judgment of the district court without reaching the other issues discussed by the majority.
 
 I.
 
 47
 First, I address the suggestion made in the majority opinion that the Airlines failed to raise the Airport monopoly argument in the district court. See Majority Opinion at 12820. The district court explained that "[the Airlines ] argue that carriers will be forced to cease operating out of the Airport if they refuse to accept the contract terms required by the Ordinance." Air Transp. Ass'n of Am. v. City & County of S.F., 992 F. Supp. 1149, 1187 (N.D. Cal. 1998). Thus, the Airlines did argue before the district court that the City's control over Airport property would require them to agree to the terms of the Ordinance or lose their access to key Airport property. The district court held, however, that the Airlines would be forced to cease operating out of the Airport "only if the potential cost or other burden of bringing a carrier's benefit plans into compliance with the otherwise-valid portions of the Ordinance is so great that air carriers will be coerced into changing their routes." Id. In other words, the district court required the Airlines to show that, rather than succumb to the City's monopoly, they would pull out of the Airport because of the costs of implementing the terms of the Ordinance. Because the parties had not provided briefing on this new requirement, the district court deferred deciding the cross-motion for summary judgment on this issue in order for them to present evidence. Id. Thus, it was in order to comply with the district court's test that the Airlines took the position"that the costs and burdens of complying with the Ordinance might force them to change their routes and services." See Majority Op. at 12821-22. On appeal, the Airlines argue that the district court's test fails to provide the full preemption protection afforded them by Congress.
 
 II.
 
 48
 We have explained that "Congress's clear and manifest purpose in enacting the [Act] was to achieve .. . the economic deregulation of the airline industry. Specifically, the [Act] . . . was designed to promote maximum reliance on competitive market forces." Charas v. Trans World Airlines, Inc., 160 F.3d 1259, 1265 (9th Cir. 1998) (en banc) (second omission in original; internal quotation marks omitted). The majority is correct that general nondiscrimination laws enforced through a governmental entity's police powers or through court action are not preempted by the Act. Majority Op. at 12819-20; see Newman v. Am. Airlines, Inc., 176 F.3d 1128, 1131 (9th Cir. 1999); Aloha Islandair Inc. v. Tseu, 128 F.3d 1301, 1303 (9th Cir. 1997); Abdu-Brisson v. Delta Air Lines, Inc., 128 F.3d 77, 84 (2d Cir. 1997). However, it is equally clear that outright bans on airline flights or the denial of access to key Airport facilities (unless the action falls within the limited proprietary powers exception which is not involved here) are preempted by the Act as an obvious restriction on competitive market forces. See Arapahoe County Public Airport Auth. v. Fed. Aviation Admin., 242 F.3d 1213, 1222 (10th Cir. 2001) ("We easily conclude the Authority's ban is connected with and relates to both services and routes. By banning scheduled passenger service, the Authority has affirmatively curtailed an air carrier's business decision to offer a particular service in a particular market.") (citations omitted); see also Air Transport Ass'n, 992 F. Supp. at 1187 ("[I]f the City applies the Ordinance to leases or other contracts that are essential to a carrier's operations at the Airport . . . . it certainly undermines the deregulatory goals of the [Act].").
 
 
 49
 The instant case deals with neither a general antidiscrimination statute nor an outright denial of airport access. The majority opinion focuses on the components of the Ordinance that are akin to garden-variety nondiscrimination statutes and causes of action. I disagree with that approach. I would hold that the Ordinance both refers to and has a connection with routes and services because if the Airlines refuse to comply with its terms, the City, by virtue of its monopoly at the Airport, would be authorized to deny the Airlines effective access to one of our nation's busiest transportation markets. I do not believe that Congress intended for municipalities to have the ability to bully Airlines into submission to local social policy, however laudable that policy might be, by threatening denial of market access.
 
 A.
 
 50
 The Supreme Court has held that a state or local law is "related to" a price, route, or service if it has"[1] a connection with, or [2] reference to" a price, route, or service. Am. Airlines, Inc. v. Wolens, 513 U.S. 219, 223 (1995) (internal quotation omitted). "Reference to" preemption occurs "[w]here a State's law acts immediately and exclusively upon[price, route, or service] . . . or where the existence of [a price, route, or service] is essential to the law's operation. " Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc., 519 U.S. 316, 325 (1997); see also Morales v. Trans World Airlines, Inc., 504 U.S. 374, 388 (1992). The paradigmatic "reference to" preemption case is Ingersoll-Rand Co. v. McClendon, 498 U.S. 133 (1990), in which the Supreme Court held that ERISA preempted "a state common law claim that an employee was unlawfully discharged to prevent his attainment of benefits under a plan covered by ERISA." Id. at 135. The Supreme Court reasoned,
 
 
 51
 The Texas cause of action makes specific reference to, and indeed is premised on, the existence of a pension plan. In the words of the Texas court, the cause of action "allows recovery when the plaintiff proves that the principal reason for his termination was the employer's desire to avoid contributing to or paying benefits under the employee's pension fund." Thus, in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists and the employer had a pension-defeating motive in terminating the employment. Because the court's inquiry must be directed to the plan, this judicially created cause of action `relate[s] to' an ERISA plan.
 
 
 52
 [The plaintiff] argues that the pension plan is irrelevant to the Texas cause of action because all that is at issue is the employer's improper motive to avoid its pension obligations. The argument misses the point, which is that under the Texas court's analysis there simply is no cause of action if there is no plan.
 
 
 53
 Id. at 140 (internal citation omitted).
 
 
 54
 It is true that the Ordinance does not single out the Airlines or explicitly address routes and services provided at the Airport. See Morales, 504 U.S. at 386 (A law"may relate to a [price, route, or service], and thereby be pre-empted, even if the law is not specifically designed to affect such[price, route, or service]." (internal quotation omitted)). However, like the Texas cause of action in Ingersoll-Rand , there would be no effective application of the Ordinance to the Airlines but for the City's monopoly control over necessary transportation services and routes located at the Airport.
 
 
 55
 I would hold the district court fell into error by brushing aside the Airlines' arguments on the basis that they would not in fact abandon their Airport business. As indicated above, this test misses the mark. Because of the City's monopoly power, the Airlines must choose either to capitulate to the City's demands or not to compete for Airport business.
 
 B.
 
 56
 To determine whether a local law has a prohibited"connection with" a price, route, or service, we look"both to the objectives of the statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on [price, route, or service]." Dillingham, 519 U.S. at 325 (internal quotation and citations omitted). If a state law's effect on price, route, or service is "too tenuous, remote or peripheral, " then the state law is not preempted. Morales, 504 U.S. at 390(internal quotation omitted). It is true, as the majority says, that "[r]ecent Supreme Court ERISA cases suggest that in order for the `effect' of a state law to cause preemption, the state law must compel or bind an ERISA plan administrator to a particular course of action with respect to the ERISA plan. " Majority Op. at 12817-18. I also agree with the majority's statement that "[b]y analogy, a local law will have a prohibited connection with a price, route, or service if the law binds the air carrier to a particular price, route or service and thereby interferes with competitive market forces within the air carrier industry." Majority Op. at 12818.
 
 
 57
 Here, I would hold that the Airlines are bound to a particular choice regarding route and service. The Ordinance presents the Airlines with a clear ultimatum: either leave the Airport or provide the required benefits program. If the Airlines had refused to comply with the Ordinance and the City were before us attempting to evict the Airlines from the Airport, it would be clear that such an action would be preempted by the Act (assuming, as is the case here, that the City is not exercising its proprietary powers within the meaning of the Act). See Arapahoe, 242 F.3d at 1222. The Supreme Court has repeatedly explained that the "broadly worded " preemption provision of the Act is meant to be "clearly expansive." See, e.g., Egelhoff v. Egelhoff, 121 S. Ct. 1322, 1327 (2001); Morales, 504 U.S. at 384. While the Supreme Court has cautioned against an "uncritical literalism" in applying this provision, Egelhoff, 121 S. Ct. at 1327, I believe that the majority reads the provision too narrowly by holding that the Airlines must in fact contemplate leaving the Airport because of the costs of implementation before preemption applies.
 
 
 58
 The majority opinion cites Duncan v. Northwest Airlines, 208 F.3d 1112 (9th Cir. 2000), in support of its position that the Airlines must demonstrate that the costs of implementing the Ordinance would drive them from the market before there is preemption under the Act. Majority Op. at 12823-24. In that case we held that a class action tort suit alleging personal injuries from second-hand smoke aboard airplanes was not preempted by the Act. Northwest argued that the lawsuit might force Northwest to prohibit smoking on its trans-Pacific flights originating in Washington state, which in turn might compel Northwest to drop such flights. Id. at 1115. We held that this connection was too tenuous because "all successful tort suits--and certainly all successful class-action tort suits--invariably carry with them an economic cost for the defendant airline." Id. In Duncan, the possibility of any compulsion upon routes or services was remote. The plaintiffs in the lawsuit did not assert that they could directly restrict Northwest's flights in order to stop second-hand smoke damage. Rather, they asked for damages, which, if awarded, might persuade Northwest to prohibit smoking on certain trans-Pacific flights, which might cause Northwest to be less competitive in that market, which might eventually lead Northwest to drop those flights. Here, the Airlines will lose competitive access to the Airport by simply refusing to accede to the demands of the City. The fact that the City's monopoly is working should not be used to establish that the Ordinance has only a tenuous connection to routes and services.
 
 
 59
 In American Airlines v. Wolens, the Supreme Court held that the Act does not "shelter airlines from suits . . . seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings." 513 U.S. at 228. The Court explained that contracts freely entered into by the airlines were enforceable because of the distinction "between what the State dictates and what the airline itself undertakes." Id. at 233. I respectfully suggest that the majority has lost sight of this distinction. The goal of the Act is "to promote maximum reliance on competitive market forces." Charas, 160 F.3d at 1265 (internal quotation marks omitted). The Ordinance dictates to the Airlines what they must do to remain competitive in the City transportation market. It is clear to me that this mechanism for implementing social policy is preempted by the Act. I would so hold and therefore, must dissent.