Filed 9/20/13 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SALVADOR RODRIGUEZ et al., | B241727 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC182763 & BC182764) |
| v. | |
| RWA TRUCKING COMPANY, INC., | ORDER MODIFYING OPINION [NO CHANGE IN JUDGMENT] |
| Defendant and Appellant. | |

THE COURT:*

It is ordered that the opinion filed herein on September 12, 2013, be modified as follows:

On pages 35-36, footnote 6, the first paragraph is deleted and the following is inserted in its place:

Division Five of this district rejected *Fitz-Gerald's* analysis in part in *People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2011) 195 Cal.App.4th 765, review granted August 10, 2011, S194388.

There is no change in the judgment.

_____

*EPSTEIN, P. J.     MANELLA, J.     SUZUKAWA, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SALVADOR RODRIGUEZ et al., | B241727 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. Nos. BC182763 & BC182764) |
| v. | |
| RWA TRUCKING COMPANY, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Emilie Elias, Judge. Affirmed in part, reversed in part, and remanded.

Miles L. Kavaller for Defendant and Appellant.

Law Offices of Stephen Glick, Stephen Glick, and Anthony Jenkins for Plaintiffs and Appellants.

Defendant RWA Trucking Company, Inc. (RWA) appeals from the trial court's judgment that it violated the unfair competition law, Business and Professions Code section 17200 (UCL or section 17200), by charging its drivers for automobile liability insurance, physical damage insurance, cargo insurance, and workers' compensation insurance from 1993 to 2011. RWA contends that the UCL causes of action and the state laws on which they are based are preempted by federal law. We affirm in part, reverse in part, and remand the matter to the trial court.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. The Parties and the Dispute

RWA is an interstate trucking company registered as a "for-hire interstate motor carrier" with the Federal Motor Carrier Safety Administration (FMCSA). At all relevant times, RWA conducted its trucking business from facilities in Long Beach, California, transporting containers and other cargo from the ports of Los Angeles and Long Beach.

RWA contracted with plaintiff Salvador Rodriguez and other drivers who owned their own tractors (drivers) under written lease agreements (Agreements). Under the Agreements, RWA leased the tractors from the drivers and dispatched the drivers to transport cargo. The Agreements characterized the drivers as independent contractors.

The Agreements required each driver to carry automobile liability insurance, physical damage insurance, and cargo insurance (collectively, liability insurance), and it gave the drivers the option either to obtain their own policies or elect coverage under RWA's fleet policies. If the drivers elected coverage under RWA's fleet policies, RWA deducted from the drivers' earnings (or "charged back" from his or her compensation) the costs of the insurance. RWA also deducted from the drivers' earnings the cost of workers' compensation insurance. The chargebacks were reflected on weekly settlement statements given to each driver.

The Agreements authorized RWA to charge an administrative fee for arranging insurance for the drivers. An administrative fee for that purpose of at least 1 percent was deducted from the drivers' compensation during some years.

RWA deducted the following amounts from the drivers for workers' compensation: December 12, 1993, to December 31, 1994: $71,688.60; December 31, 1994, to December 31, 1995: $71,688.60.

During the years 1993 to 1995, RWA collected from its drivers a 1 percent administration fee for automobile liability insurance, physical damage insurance, and cargo insurance. During the years 1996 to 2002, RWA collected significantly less from its drivers than it paid in insurance premiums, ranging from $2,611.48 in 2002 to $244,269.55 in 1997. During the years 2003 to 2009, RWA deducted more from its drivers than it paid in insurance premiums.

## II.    The Present Litigation

### A.    The Pleadings and Class Certification

Plaintiff filed the present action in Los Angeles Superior Court in 1997. The complaint alleged: (1) plaintiff was an employee, not an independent contractor, but was denied employee benefits; (2) defendants failed to comply with federal Truth-in-Leasing regulations, thereby breaching fiduciary duties to plaintiff; and (3) defendants sold insurance to plaintiff without a license. (*Rivas v. Rail Delivery Serv.* (9th Cir. 2005) 423 F.3d 1079, 1081.) On January 16, 1998, defendants removed the case to federal court; on September 8, 2005, the Ninth Circuit held plaintiff lacked article III standing and remanded the case back to state court. (*Id*. at p. 1084.)

Plaintiff filed the operative fourth amended complaint on May 12, 2009. The first cause of action alleged RWA "transacted insurance" within the meaning of Insurance Code section 1631 by "selling insurance to Plaintiff for compensation" and "charging Plaintiff an administrative fee of at least 1% on the aforementioned insurance that Defendant sold to Plaintiff." Such transactions were unlawful, plaintiff alleged, because RWA was not licensed to transact insurance in California. Further, RWA "failed to

3

properly disclose the total premium it charged Plaintiff and each Class Member by failing to properly disclose the at least 1% commission Defendants earned, violating California Insurance Code § 381(f)." These Insurance Code violations were alleged to be unlawful and to constitute unfair business practices in violation of the UCL. The second cause of action alleged RWA violated section 17200 by charging plaintiff for workers' compensation insurance, in violation of Labor Code section 3751 (section 3751) and *Albillo v. Intermodal Container Services, Inc.* (2003) 114 Cal.App.4th 190 (*Albillo*).

The court granted plaintiff's motion for class certification and, on June 9, 2011, it issued an order certifying the following class: "All persons and entities in California that provided trucking services, including the transport of cargo and freight, for RWA Trucking Co., Inc., from December 12, 1993 through the present, who had money deducted from their earnings by RWA Trucking Co., Inc. to pay for Liability Insurance Coverage, Property Damage Insurance Coverage, Cargo Loss Insurance Coverage, or Workers' Compensation Insurance Coverage."

### B. *Trial and Decision*

The case went to trial on stipulated facts. On December 6, 2011, the court filed a statement of decision. Following is a summary.

#### 1. First Cause of Action:  Transacting Insurance Without a License

Prior to trial, the court found that RWA was transacting insurance and receiving compensation for doing so within the meaning of the Insurance Code. The court explained: "It is undisputed that RWA received compensation in connection with obtaining insurance for Rodriguez. Accordingly, RWA was required to have a license to transact insurance, but, undisputedly, RWA did not have a license.  [¶]  The Court finds that *Albillo v. Intermodal Container Services, Inc.*[, *supra*,] 114 Cal.App.4th 190 does not compel a different result as to the transacting insurance without a license issue."  (Fn. omitted.)

4

Following trial, the court further found that RWA did not comply with the Insurance Code's disclosure requirements: "RWA stipulated that it did not comply with Insurance Code § 381 . . . . RWA did not give any class member an insurance policy or certificate of insurance, nor any of the items listed in Insurance Code Section 381, i.e., nothing was given to the class members that showed the insurance premium, rates, or criteria used to determine how much to charge the truck driver for insurance.

". . . RWA stipulated in Fact Nos. 38, 47 and 48, just as Farmers did in the *Troyk* case, that it charged Plaintiff an 'administrative fee' for providing insurance to Plaintiff. *Troyk* [*v. Farmers Group, Inc.* (2009)] 171 Cal.App.4th [1305,] 1324-1325. RWA, like Farmers, did not comply with the disclosure requirement in Insurance Code § 381(f). Following *Troyk*, RWA violated Insurance Code § 381(f) and Plaintiff has established through Stipulated Fact No. 48 that Plaintiff and each class member has standing to sue RWA under California's Unfair Competition Laws for RWA's violation of Insurance Code § 381(f).

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . The Court also rejects RWA's argument that its practice of violating Insurance Code § 381 is permitted by the 'Truth-in-Leasing' regulation in 49 C.F.R. § 376.12(j).[1] Regardless whether charge-backs for insurance might be permitted, RWA must comply with the law in making any such charge-backs, such as complying with California Insurance Code § 381."

Based on these findings, the court found that RWA violated the "unlawful" prong of section 17200, and it ordered restitution in the amount of "the difference for each class member between the premium for each such insurance and the amount of money deducted by RWA from each class member for such insurance," or $502,636.32, plus prejudgment interest of $377,490.33.

---

**1** Unless otherwise indicated, all further references to the federal regulations are to title 49 of the Code of Federal Regulations (49 C.F.R.).

### 2. Second Cause of Action: Charging Plaintiffs for Workers' Compensation Insurance

Prior to trial, the court granted plaintiffs' motion for summary adjudication of the second cause of action. The court found that under *Albillo*, RWA was not permitted to require plaintiffs to reimburse it for the cost of workers' compensation insurance. It explained: "The facts of this case are nearly identical to the facts in *Albillo*. Here, as in *Albillo*, the Workers' Compensation Policy at issue protects Defendant from lawsuits made by Plaintiff, should Plaintiff suffer a work-related injury. Following *Albillo*, Plaintiff is treated as though he were an employee and Defendant is treated as if it were an employer under the § 4150 election; thus, it is unlawful for Defendant to receive from Plaintiff any portion of the cost of the Workers' Compensation Insurance. *Albillo*, 114 Cal.App.4th at 198.

"The *Albillo* Court explained, 'While it is correct that an election under Labor Code section 4150 does not make a person an employee for all purposes, it does expressly subject him or her to the compensation provisions of division 4 of the Act. Labor Code section 3751 is one of those provisions. [Citation.] Accordingly, we hold that by deducting amounts from appellants' compensation to secure workers' compensation coverage, respondents violated Labor Code section 3751.' [Citation.]"

Following trial, the court applied its summary adjudication holding to the entire plaintiff class and ordered RWA to "restore to Plaintiff and the Class all funds RWA retained by means of the unfair and unlawful business acts and practices alleged herein." It awarded the plaintiff class "the principal amount of $143,377.20, and prejudgment interest through September 26, 2011 in the amount of $233,360."

### 3. Federal Preemption

In concluding that plaintiffs were entitled to compensation for RWA's violations of California law, the court determined that these laws were not preempted by federal law, namely, the Federal Aviation Administration Authorization Act of 1994 (FAAAA), title 49 United States Code section 14501 et seq., or the Truth-in-Leasing Act. It

explained: "There is no California case that says that the UCL is preempted in a FAAA[A] case. [¶] . . . [¶] . . . Equally important, the U.S. District Court for the Central District of California already rejected the precise preemption arguments raised by RWA; holding that Plaintiff's claims here are not preempted by 49 U.S.C. § 14501(c). *See Renteria v. K & R Transportation, Inc.* (C.D.Cal. 1999) 1999 WL 33268638. . . . Furthermore, the McCarran-Ferguson Act, 15 U.S.C. § 1012, prevents the Court from interpreting 49 U.S.C. § 14501(c) so as to preempt Plaintiff's claims that are based upon California insurance laws. Here, Congress expressly reiterated State authority to regulate insurance when enacting 49 U.S.C. § 14501(c)(2). *Renteria*, 1999 WL 33268638 at *2. The *Renteria* Court held that '[t]he aim of the regulation [49 C.F.R. § 376.12(j)(1)] is to compel disclosure of the contract terms between the owner-operators and the carriers, ***not to govern the terms for which the parties are permitted to bargain. Nothing in the federal regulations prevents a state from passing legislation that mandates a particular contract term with regard to the costs of insurance.*** Similarly, while separate licensing requirements in each state may impact carriers in some way, the brokering of insurance is not the focus of the federal law[,]' so 49 U.S.C. § 14501(c) does not preempt California's worker's compensation insurance or liability insurance laws. *Renteria*, 1999 WL 33268638 at *3 (emphasis added). Under 49 U.S.C. § 14501(c), '[t]he effects of the state insurance, wage, and workers' compensation laws on defendants . . . [are] insufficient to "relate to" prices. . . . Additionally, insurance and wage requirements are areas generally reserved to the states. *See* [*Californians for Safe and Competitive Dump Truck Transp. v.*] *Mendonca* [(9th Cir. 1998) 152 F.3d 1184]; 49 U.S.C. § 14501(c)(2).' *Renteria*, 1999 WL 33268638 at *4." (Fns. & underling omitted.)


### C. Judgment and Appeal

The court entered judgment on May 22, 2012. The judgment awarded plaintiffs "as and for restitution for the first cause of action the sum of $502,636.32 principal, plus prejudgment interest through May 17, 2012 in the amount of $409,716,08 and for the

7

second cause of action, $143,377.20 principal plus prejudgment interest in the amount of $231,845.50 through May 17, 2012 for a total of $1,287,575.10."

Notice of entry of judgment was served on May 25, 2012. RWA timely appealed from the judgment, and plaintiffs timely cross-appealed.

**RWA'S APPEAL**

RWA contends: (1) RWA did not engage in the sale of insurance under California law; if it did violate California insurance law, that law is preempted by federal law; (2) California law, which prohibits an employer from charging an independent contractor the costs of his or her workers' compensation insurance, is preempted by the FAAAA; (3) the trial court erred in awarding plaintiffs prejudgment interest. Because RWA's appeal presents solely issues of law on stipulated facts, our review is de novo. (*Weingarten Realty Investors v. Chiang* (2012) 212 Cal.App.4th 163, 167.)

## I. FEDERAL LAW PREEMPTS PLAINTIFFS' CLAIM FOR UNLAWFULLY TRANSACTING INSURANCE

During all the years relevant to this action, RWA required each of its drivers to maintain automobile liability insurance, physical damage insurance, and cargo insurance for his or her vehicle. RWA gave each driver the option of accepting coverage under RWA's fleet policies; if the driver elected such coverage, RWA deducted the cost of the insurance from the driver's earnings. During some years, RWA also deducted an additional administrative fee from the drivers' earnings.

Plaintiffs allege that these deductions or "chargebacks" constitute the "transacting" of insurance without a license in violation of the Insurance Code. RWA disagrees, contending that the chargebacks at issue do not violate the California Insurance Code; in the alternative, RWA urges that if the chargebacks do violate California law, that law is preempted by federal law. We address these issues below and conclude that because the claim for unlawfully transacting insurance is preempted by federal law, the

8

award of restitution and prejudgment interest as to the first cause of action must be reversed.

### A. *"Transacting" Insurance Under California Law*

Insurance Code section 1631 provides that unless exempt by the provisions of this article, a person "shall not solicit, negotiate, or effect contracts of insurance, or act in any of the capacities defined in Article 1 (commencing with Section 1621)" unless the person holds a valid insurance license. The capacities defined in article 1 of the code include acting as an insurance broker—i.e., "for compensation and on behalf of another person, *transact[ing] insurance* . . . with, but not on behalf of, an admitted insurer." (Ins. Code, § 1623, subd. (a), italics added.)

"Transacting insurance" under section 35 of the Insurance Code includes all of the following:

"(a) Solicitation.

"(b) Negotiations preliminary to execution.

"(c) Execution of a contract of insurance.

"(d) Transaction of matters subsequent to execution of the contract and arising out of it."

Insurance Code section 1635, subdivision (h) provides that an individual need not hold a license to complete or deliver a declaration or certificate of coverage "under a running inland marine insurance contract evidencing coverage thereunder and including only those negotiations as are necessary to the completion or delivery if the person performing those acts or his or her employer has an insurable interest in the risk covered by the certificate or declaration," so long as "no commission is paid or allowed, directly or indirectly, by the insurer, creditor, retailer, or other person for acting in those capacities or engaging in those activities."

Plaintiffs contend that by purchasing insurance for its drivers and charging the drivers an administrative fee, RWA "transacted insurance" for compensation within the meaning of the Insurance Code. Further, plaintiffs urge that RWA does not come within

9

the exemption of Insurance Code section 1635, subdivision (h), because not all the insurance coverage RWA provided its drivers was cargo insurance, and RWA recovered a commission for transacting insurance for its drivers.

For the reasons that follow, we believe that California insurance law, if interpreted as plaintiffs suggest, is preempted by federal law. We therefore assume for the sake of argument that RWA's activities *did* violate California law and address the preemption issue below.

### B. *Federal Law Governing "Chargebacks" of Insurance Costs by Federal Motor Carriers*

#### 1. Federal Truth-in-Leasing Regulations

As federal cases have recognized, motor carriers frequently prepay the costs of certain goods for which drivers ultimately may be responsible. The cost of these items then is deducted from drivers' compensation in a process known as "chargebacks." Chargebacks are noted along with compensation on drivers' weekly pay stubs, also known as settlement sheets or statements. (*Owner-Operator Independent Drivers Asso., Inc. v. Swift Transportation Co., Inc.* (9th Cir. 2011) 632 F.3d 1111 (*Swift*).

The Department of Transportation is authorized to regulate the relationships between drivers and motor carriers, including required terms of their leases. The federal Truth-in-Leasing regulations, 49 C.F.R. part 376, set forth specific requirements with regard to chargebacks. (*Swift*, *supra*, 632 F.3d at p. 1113, citing *OOIDA v. Swift Transp. Co.* (9th Cir. 2004) 367 F.3d 1108, 1110.)

#### 2. Federally Mandated Motor Carrier Liability Insurance

Section 13906 of title 49 of the United States Code requires federal motor carriers to carry specified levels of liability insurance, as follows: "Liability insurance requirement. The Secretary [of Transportation] may register a motor carrier under section 13902 only if the registrant files with the Secretary a bond, insurance policy, or other type of security approved by the Secretary, in an amount not less than such amount

as the Secretary prescribes pursuant to, or as is required by, sections 31138 and 31139, and the laws of the State or States in which the registrant is operating, to the extent applicable.  The security must be sufficient to pay, not more than the amount of the security, for each final judgment against the registrant for bodily injury to, or death of, an individual resulting from the negligent operation, maintenance, or use of motor vehicles, or for loss or damage to property (except property referred to in paragraph (3) of this subsection), or both."  (49 U.S.C. § 13906(a)(1).)  The Secretary "may determine the type and amount of security filed under this section."  (49 U.S.C. § 13906(d).)

The Truth-in-Leasing regulations, 49 C.F.R. section 376.12(j), provide for the allocation of these insurance costs between motor carriers and drivers as follows:

"Insurance.  (1)  The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906.  The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance.  If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.

"(2)  If the lessor purchases any insurance coverage for the operation of the leased equipment from or through the authorized carrier, the lease shall specify that the authorized carrier will provide the lessor with a copy of each policy upon the request of the lessor.  Also, where the lessor purchases such insurance in this manner, the lease shall specify that the authorized carrier will provide the lessor with a certificate of insurance for each such policy.  Each certificate of insurance shall include the name of the insurer, the policy number, the effective dates of the policy, the amounts and types of coverage, the cost to the lessor for each type of coverage, and the deductible amount for each type of coverage for which the lessor may be liable."

11

3. Federal Cases Holding That Motor Carriers May Lawfully Charge Back Insurance Costs to Drivers

The Seventh Circuit Court of Appeals considered whether section 376.12 permits motor carriers to lawfully charge back to drivers the costs of liability insurance in *Owner-Operator Independent Drivers Asso., Inc. v. Mayflower Transit, LLC* (7th Cir. 2010) 615 F.3d 790 (*Mayflower*). There, defendant Mayflower paid its truck drivers a negotiated price per mile, reduced by the cost of insurance in the form of a chargeback. Some of the truckers sued, contending that the chargebacks violated 49 C.F.R. section 376.12(i), which provides that "the lessor is not required to purchase or rent any products, equipment, or services from the authorized carrier as a condition of entering into the lease arrangement." The truckers contended that a requirement to reimburse Mayflower for the cost of insurance constituted a "purchase" of insurance within the meaning of section 376.12(i). (*Id.* at p. 791.)

The Seventh Circuit disagreed. It explained: "Plaintiffs treat the chargeback as a sale of insurance *by* Mayflower. Yet it is not an insurer. It is not authorized to underwrite risks. The regulation requires motor carriers to purchase insurance underwritten by *real* insurers, so that persons injured by a motor carrier's operations may find a source of compensation more reliable than the motor carrier itself, which often is thinly capitalized. Mayflower is a large and solvent firm that has been in business for decades; it can pay for its own casualties (and will do so indirectly because its insurer will set an experience-rated premium that covers the costs of indemnity, plus a loading charge for the insurer's administrative overhead). But many other motor carriers are small, and some would take too few precautions against accidents if they anticipated that a major loss would lead them to declare bankruptcy. Then the owners would reap profits as they came in, and use the corporate shield of limited investors' liability to protect themselves against tort judgments. The insurance requirement prevents that. And the regulation places on the motor carrier under whose certificate the service is rendered the obligation to secure insurance; that makes enforcement much easier than placing a separate mandatory-insurance obligation on the many owner-operators who own and

12

lease a single truck.  Yet nothing in this rationale for mandatory insurance implies that lessors need not *pay* for the coverage secured through the motor carrier; as we've observed already, they will pay indirectly (through lower rates per mile) if they do not pay through a chargeback."  (*Mayflower*, *supra*, 615 F.3d at p. 793.)

The court continued:  "If this were not clear from the text of § 376.12(*i*) and the fact that Mayflower is not an insurer (so it can't be selling insurance to the lessors), it is made clear by comparing § 376.12(*i*) with § 376.12(j)(1), which speaks to the topic.  This subsection, captioned 'Insurance,' reads:  [¶]  'The lease shall clearly specify the legal obligation of the authorized carrier to maintain insurance coverage for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906.  The lease shall further specify who is responsible for providing any other insurance coverage for the operation of the leased equipment, such as bobtail insurance.  If the authorized carrier will make a charge back to the lessor for any of this insurance, the lease shall specify the amount which will be charged-back to the lessor.'  [¶]  The reference to chargebacks in the third sentence is incompatible with the owner-operators' contention that chargebacks are 'sales' forbidden by § 376.12(*i*).  Courts do not read regulations to create such a glaring, and unnecessary, inconsistency.

"Plaintiffs want us to read the third sentence, which speaks of chargebacks, as limited to the second, which deals with 'other insurance coverage . . . such as bobtail insurance.'  But the third sentence refers to 'any' of 'this' insurance, and that construction is best understood as including the insurance mentioned in the whole subsection.  It would have been easy to write:  'If the authorized carrier will make a charge back to the lessor for any of [the other] insurance [mentioned in the previous sentence], the lease shall specify the amount which will be charged-back to the lessor.'  But that's not what the third sentence says.  Section 376.12(j)(1) confirms our understanding of § 376.12(*i*):  A chargeback for the cost of insurance is not a sale of insurance."  (*Mayflower*, *supra*, 615 F.3d at pp. 793-794.)

The Eighth Circuit Court of Appeals reached a similar result in *Owner-Operator Independent Drivers Asso. v. United Van Lines, LLC* (8th Cir. 2009) 556 F.3d 690

(*United*). There, individual truckers who leased trucks to United Van Lines, a federally registered motor carrier, alleged that United improperly charged back the cost of federally-mandated public liability and property damage (PL/PD) insurance. The court disagreed: "'The first sentence [of § 376.12(j)(1)] establishes that all carriers must maintain public liability and property damage insurance. The second sentence provides that carriers and drivers may decide who is responsible for maintaining other insurance, such as bobtail insurance. The third sentence permits the carrier to charge back to the driver 'any of this insurance.' The inclusion of the word 'any' and the exclusion of the word 'other' signify that 'this insurance' [in the third sentence] refers to all insurance referenced in the paragraph, not just to the insurance discussed in the previous sentence.'" (*Id.* at p. 697.) The court also rejected the truckers' contention that construing section 376.12(j)(1) to permit chargebacks conflicted with federal motor carrier financial responsibility statutes, which the truckers urged reflected Congress's intent to bar insurance chargebacks so as to improve carriers' level of care. The court explained: "Without question, Congress requires that motor carriers maintain adequate levels of PL/PD insurance to protect the public and to encourage safer motor carrier operations. *See* 49 C.F.R. § 387.1. But the statutes requiring insurance and minimum levels of financial responsibility—49 U.S.C. §§ 13906(a) and 31139—do not specify which party to a motor carrier lease must bear the cost of that insurance. Thus, the legislation 'neither grants nor denies the [Secretary] power to regulate compensation paid under lease arrangements.' . . . In these circumstances, we must apply the plain language of § 376.12(j)(1) reflecting the Secretary's decision not to dictate how these private parties must resolve this aspect of their financial arrangement." (*Id.* at p. 697, fn. omitted.)[2]

---

[2]     Plaintiffs quote *United* only in part and assert that "*United* held that Congress has not addressed who must pay for the insurance, or whether a trucking company can transact insurance as an insurance broker under state law for that matter, thus leaving the states to exercise their traditional state power to make such determination." Not so. Immediately after the sentence plaintiffs quote, the court states that in the absence of a clear statement by Congress of whom shall bear the cost of liability insurance, courts

14

4. <u>Federal Cases Holding That Motor Carriers May Lawfully Mark-up Chargebacks to Drivers</u>

In *Swift*, *supra*, 632 F.3d 1111, the Ninth Circuit considered the claim of independent drivers that motor carriers violated federal law by marking-up chargebacks. The court concluded that federal law permitted motor carriers to mark-up chargebacks, as long as the mark-ups were not excessive. The court explained: "[49 C.F.R § 376.12] intended to curb excessive mark-ups by motor carriers and level the playing field with regard to information about how charge-backs are computed. *See* Final Rule, 47 Fed.Reg. 51136, 51139, 1982 WL 146684 (Nov. 12, 1982). However, [drivers] seem to erroneously equate 'excessive' with 'any' mark-ups in this instance. *See DC Opinion & Order*, 2007 WL 2808997, at *2. The district court, and virtually every court that has addressed the issue, has correctly concluded that profiting from charge-backs is not per se unlawful. *Id.*; *see also*, *e.g.*, [*Owner-Operator Indep. Drivers Ass'n v. Landstar Sys.*], 622 F.3d [1307,] 1319 [(11th Cir. Fla. 2010)]; *OOIDA v. C.R. England, Inc.*, 508 F.Supp.2d 972, 981 (D.Utah 2007) ('[C]harge-backs that include profits and fees are not *per se* unlawful under § 376.12(h). . . .'). Thus, to ascribe to the regulations a purpose of eliminating carriers' profits is unsustainable." (*Swift*, *supra*, at p. 1117, fn. omitted.)

5. <u>Summary</u>

*Mayflower* and *United* stand for the proposition that federal law permits motor carriers to charge back the cost of liability insurance to their drivers. *Swift* stands for the related proposition that federal law also permits motor carriers to profit from chargebacks by marking-up (or charging an administrative fee on) charged-back items. Having thus established the state of federal law, we turn to the question before us—whether these federal regulations preempt contrary state law.

_____

must apply the plain language of federal regulations "reflecting the Secretary's decision not to dictate how these private parties must resolve this aspect of their financial arrangement." (*United*, *supra*, 556 F.3d at p. 697.)

15

C. *Federal Preemption*

"A preemption 'question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State? If so, the Supremacy Clause requires courts to follow federal, not state, law.' (*Barnett Bank* [*of Marion Cty., N. A. v. Nelson* (1996)] 517 U.S. [25,] 30, citing U.S. Const., art. VI, cl. 2; see also *Viva! Internat. Voice for Animals v. Adidas Promotional Retail Operations, Inc*. (2007) 41 Cal.4th 929, 935 (*Viva! International*).)" (*Parks v. MBNA America Bank, N.A*. (2012) 54 Cal.4th 376, 382-383 (*Parks*).)

The Supreme Court has recognized "'four species of federal preemption: express, conflict, obstacle, and field.' (*Viva! International*, *supra*, 41 Cal.4th at p. 935.) 'First, express preemption arises when Congress "define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] . . . ." [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when "'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" [Citations.] Finally, field preemption, i.e., "Congress' intent to pre-empt all state law in a particular area," applies "where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation." [Citation.]' (*Id*. at p. 936; accord, *Bronco Wine Co. v. Jolly* (2004) 33 Cal.4th 943, 955; see also *Barnett Bank*, *supra*, 517 U.S. at p. 31.)" (*Parks*, *supra*, 54 Cal.4th at p. 383.)[3]

---

[3]     "Federal regulations have the same preemptive effect as the statutes under which they are promulgated, and the agency's reasonable construction of the statute it is charged with enforcing is entitled to deference. (*Aguayo v. U.S. Bank* (9th Cir. 2011) 653 F.3d 912, 919, 920.) The agency's interpretation of its own regulations controls unless it is plainly erroneous or inconsistent with the regulations. (*Long Island Care at Home, Ltd.*

We begin with obstacle preemption. Obstacle preemption is implicated when state law "stands as an obstacle to the accomplishment and execution of" federal law. (*Parks*, *supra*, 54 Cal.4th at p. 383.) Such preemption may exist even where compliance with both federal and state law is not impossible—i.e., because federal law "*requires . . . something that state law prohibits*." (*Id*. at p. 384.) Rather, obstacle preemption may exist where state law prohibits something permitted (but not required) by federal law, thus standing as an obstacle to accomplishing the purposes of the federal law.

*Parks* illustrates such circumstances. In *Parks*, the California Supreme Court considered whether the National Bank Act of 1864 (NBA), which grants national banks "'all such incidental powers as shall be necessary to carry on the business of banking,'" preempted Civil Code section 1748.9, a California law requiring that certain disclosures accompany preprinted checks issued by a credit card issuer to its cardholders. (*Parks*, *supra*, 54 Cal.4th at p. 380.) Specifically, section 1748.9 required that a credit card issuer that extended credit to a cardholder through preprinted checks (convenience checks) "'shall disclose on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft, in clear and conspicuous language, all of the following information: (1) That "use of the attached check or draft will constitute a charge against your credit account." (2) The annual percentage rate and the calculation of finance charges, as required by Section 226.16 of Regulation Z of the Code of Federal Regulations, associated with the use of the attached check or draft. (3) Whether the finance charges are triggered immediately upon the use of the check or draft.'" (*Parks*, *supra*, at p. 380.) The federal NBA did not require such disclosures. After using convenience checks that did not include the disclosures required by section 1748.9, plaintiff sued his credit card company, MBNA America Bank (MBNA), on behalf of himself and similarly situated MBNA customers, alleging that the bank engaged in unfair competition in violation of section 17200 by failing to make the disclosures mandated by section 1748.9. (*Id*. at p. 381.)

_____

*v. Coke* (2007) 551 U.S. 158, 170-171.)" (*Akopyan v. Wells Fargo Home Mortgage, Inc*. (2013) 215 Cal.App.4th 120, 138.)

17

The Supreme Court held that plaintiff's claims under sections 17200 and 1748.9 were preempted by the NBA. (*Parks*, *supra*, 54 Cal.4th at pp. 386-387.). The court explained that the broad power granted by the NBA to national banks to exercise "'all such incidental powers as shall be necessary to carry on the business of banking'" expressly included the power to loan money on personal security. (*Id.* at pp. 386-387.) The disclosure requirements in section 1748.9 purported to impose a condition on that federally granted power, providing that it could be exercised only if national banks offered credit through convenience checks containing specific disclosures. Further, "[t]he specific disclosure obligations imposed by section 1748.9 exceed any requirements in federal law. The requirement in section 1748.9 that disclosures appear 'on the front of an attachment that is affixed by perforation or other means to the preprinted check or draft' has no counterpart in federal law. The same is true of section 1748.9's requirement that precise language ("'use of the attached check or draft will constitute a charge against your credit account'") appear on each check. (§ 1748.9, subd. (a)(1).) In addition, although federal regulations require certain disclosures when the terms of using a convenience check differ from the terms of the customer's credit account (12 C.F.R. § 226.9(b)(1), (2) (2012)), they do not mandate that every convenience check disclose '[w]hether the finance charges are triggered immediately upon the use of the check,' as section 1748.9, subdivision (a)(3) requires." (*Id.* at p. 387.)

The court continued: "In characterizing the disclosure requirements of section 1748.9, the Court of Appeal said that the statute 'does not *forbid* the exercise of a banking power authorized by the NBA. Section 1748.9 does not bar national banks from loaning money on personal security through convenience checks.' It is true that section 1748.9 . . . does not outlaw a category of banking activity. However, to say that MBNA *may* offer convenience checks *so long as* it complies with section 1748.9 is equivalent to saying that MBNA *may not* offer convenience checks *unless* it complies with section 1748.9. Whether phrased as a conditional permission or as a contingent prohibition, the effect of section 1748.9 is to forbid national banks from offering credit in the form of convenience checks unless they comply with state law. As demonstrated by the instant

18

lawsuit brought under California's unfair competition law (Bus. & Prof. Code, § 17200 et seq.), a national bank may be subject to monetary liability, and its convenience check offers may be enjoined, if it does not comply." (*Parks*, *supra*, 54 Cal.4th at pp. 387-388.) Such a requirement, the court concluded, "'significantly impair[s] the exercise of authority' granted to national banks by the NBA." (*Id*. at p. 388.)

Further, the court said, although the disclosures required by California law were not themselves onerous, "our preemption analysis must consider the burden of disclosure 'regimes imposed not just by [California], but by all States in which the banks operate.' (*Watters* [*v. Wachovia Bank, N.A.* (2007)] 550 U.S. [1,] 13.) If disclosure requirements such as those in section 1748.9 were allowed to stand, national banks operating in multiple states would face the prospect of '"limitations and restrictions as various and as numerous as the States." [Citation.]' (*Id*. at p. 14.) National banks would have to monitor requirements as to the content, language, manner, and format of disclosures for each of the 50 states (and possibly municipalities as well), and continually adjust their convenience check offers to comply with the prescriptions of each local jurisdiction. Such '[d]iverse and duplicative [regulation] of national banks' engagement in the business of banking . . . is precisely what the NBA was designed to prevent.' (*Id*. at pp. 13-14.)" (*Parks*, *supra*, 54 Cal.4th at pp. 388-389.)

Applying the principles articulated in *Parks*, we conclude that if state insurance laws prohibit RWA from charging back its liability insurance costs to its drivers, those laws are preempted by 49 C.F.R. section 376.12. As we have said, 49 C.F.R. section 376.12 permits motor carriers to charge back liability insurance costs to its drivers, so long as the amounts of those chargebacks are clearly specified. In contrast, if California insurance law is interpreted as plaintiffs suggest, it would *forbid* such chargebacks unless the motor carriers were licensed to sell insurance. Thus, under plaintiffs' interpretation of California law, it would prohibit precisely the kind of chargebacks that federal law permits.

As in *Parks*, there is no indication here that Congress intended to subject the rights granted by federal regulation to state or local restriction. (*Parks*, *supra*, 54 Cal.4th at

p. 387.) And, as in *Parks*, if the present state law is enforceable against federal motor carriers, motor carriers may be subject to monetary liability if they do not comply with state law. Thus, as in *Parks*, requiring compliance with state insurance regulation as a condition of charging back insurance costs to drivers under the federal Motor Carrier Act would "'significantly impair the exercise of authority' granted" under federal law. (*Id*. at p. 388.) Further, if the state insurance law at issue is allowed to stand, motor carriers operating in multiple states would face the prospect of ""'limitations and restrictions as various and as numerous as the States." [Citation.]' [Citation.]" (*Ibid*.) Federal motor carriers would have to monitor chargeback requirements for each of the 50 states and continually adjust their leases with drivers to comply with the prescriptions of each local jurisdiction. "Such '[d]iverse and duplicative [regulation] . . . is precisely what the [FAAAA] was designed to prevent.' [Citation.]" (*Id*. at pp. 388-389.)[4]

Plaintiffs contend that obstacle preemption cannot apply where Congress has expressly defined the scope of preemption, but we do not agree. As our Supreme Court has explained: "'In *Freightliner Corp. v. Myrick* (1995) 514 U.S. 280, the court clarified the relation between express preemption clauses and implied preemption doctrines, explaining that "an express definition of the pre-emptive reach of a statute 'implies'— *i.e.*, supports a reasonable inference—that Congress did not intend to pre-empt other matters," *but the express clause does not* "*entirely foreclose[] any possibility of implied pre-emption*."'" (*Martinez v. Regents of University of California* (2010) 50 Cal.4th 1277, 1297, italics added; see also *Freightliner Corp. v. Myrick*, *supra*, 514 U.S. at p. 287 ["As an initial matter, we must address the argument that we need not reach the conflict pre-emption issue at all. According to respondents and the Court of Appeals, *Cipollone v. Liggett Group, Inc*., 505 U.S. 504 (1992) held that implied pre-emption cannot exist when Congress has chosen to include an express pre-emption clause in a statute. *This argument is without merit*."], italics added.)

---

[4] Because we have concluded that obstacle preemption applies, we need not consider the other three species of federal preemption.

Plaintiffs also contend that the McCarran Ferguson Act, title 15 of the United States Code section 1012, prohibits the court from finding that the FAAAA preempts provisions of the Insurance Code. Again, we do not agree. The McCarran-Ferguson Act provides: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, *unless such Act specifically relates to the business of insurance*[.]" (15 U.S.C. § 1012(b), italics added.) "This act preserves a state statute from federal preemption where: '(1) the state statute has been enacted "for the purpose of regulating the business of insurance;" (2) application of the relevant federal statute would "invalidate, impair, or supersede" that state statute; and (3) the federal statute does not itself "specifically relate to the business of insurance."' [Citations.] [¶] As the United States Supreme Court has explained, consistent with Congress's clear mandate under the McCarran-Ferguson Act, 'state laws enacted "for the purpose of regulating the business of insurance" do not yield to conflicting federal statutes *unless a federal statute specifically requires otherwise*.' [Citations.]" (*Pagarigan v. Superior Court* (2002) 102 Cal.App.4th 1121, 1135.)

In the present case, the controlling federal statutes and rules clearly "relate to" the business of insurance. Title 49 United States Code section 13903 requires motor carriers to file a bond or insurance policy; section 31139 authorizes the Secretary of Transportation to "prescribe regulations to require minimum levels of financial responsibility sufficient to satisfy liability amounts established by the Secretary covering public liability, property damage, and environmental restoration for the transportation [of property] by motor carrier"; and section 14102 authorizes the Secretary of Transportation to require motor carriers using motor vehicles owned by others to "obtain liability and cargo insurance on them." These powers are implemented through 49 C.F.R. section 376.12(j), which is entitled "Insurance" and requires that leases between motor carriers and drivers shall "clearly specify the legal obligation of the authorized carrier *to maintain insurance coverage* for the protection of the public pursuant to FMCSA regulations under 49 U.S.C. 13906" and shall "further specify who is responsible for providing *any other*

21

*insurance coverage* for the operation of the leased equipment, such as bobtail insurance." (Italics added.)

Plaintiffs contend, finally, that even if RWA did not violate the Insurance Code, it violated 49 C.F.R. section 376.12 because it did not provide its drivers with certificates of insurance that specified the cost to the drivers of each kind of insurance coverage. Whatever the merits of this argument, it was neither pled in the operative complaint nor litigated in the trial court, and thus we do not reach it.

## II. THE FAAAA DOES NOT PREEMPT CALIFORNIA LAW PROHIBITING EMPLOYERS FROM SEEKING REIMBURSEMENT FROM INDEPENDENT CONTRACTORS FOR THE COST OF WORKERS' COMPENSATION INSURANCE

During some of the years relevant to this action, RWA charged back to plaintiffs RWA's costs for workers' compensation insurance. Plaintiffs contend this violated section 3751, as interpreted by *Albillo*, *supra*, 114 Cal.App.4th 190. RWA agrees that charging plaintiffs for workers' compensation insurance violated California law, but urges that the state law is expressly preempted by the FAAAA. For the reasons that follow, plaintiffs are correct. We conclude that because section 3751 is not preempted by federal law, the award of restitution under the second cause of action was proper.

### A. The Workers' Compensation Law

The workers' compensation law (Lab. Code, § 3200 et seq.) "is a comprehensive statutory scheme that governs the compensation provided to California employees for injuries occurring during the course and scope of their employment. (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 810 . . . .) . . . 'The underlying premise behind this statutorily created system of workers' compensation is the "'compensation bargain.'" [Citation.] Pursuant to this presumed bargain, "the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded

22

relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort." [Citation.]' (*Id*. at p. 811.)" (*Albillo*, *supra*, 114 Cal.App.4th at p. 199.)

Independent contractors are not, by statute, subject to the workers' compensation laws. However, pursuant to Labor Code section 4150, employers and independent contractors may elect to "come under the compensation provisions of this division," including the workers' compensation provisions.

Section 3751, subdivision (a) prohibits employers from deducting the cost of workers' compensation insurance from employee wages.[5] "Stated simply, this provision requires the employer to bear the entire cost of securing compensation." (*Albillo*, *supra*, 114 Cal.App.4th at p. 201.) The California Courts of Appeal have interpreted section 3751 to apply to independent contractors who have elected to come within the workers' compensation insurance system. (*Albillo*, *supra*, at p. 194.) Thus, under California law, "[p]arties who elect to 'come under the compensation provisions of this division' necessarily elect to come under Labor Code section 3751," which bars employers from requiring independent contractors to cover any portion of the cost of compensation. (*Albillo*, *supra*, at p. 201.)

The parties agree that under California law—specifically, section 3751 and *Albillo*—RWA could not lawfully have charged the plaintiff class for the cost of workers' compensation insurance. RWA contends, however, that the FAAAA expressly preempts California law in this area and, therefore, charging plaintiffs for workers' compensation insurance was not unlawful. Plaintiffs disagree, contending that section 3751 and *Albillo* are not preempted by the FAAAA.

---

[5]    Section 3751 provides: "No employer shall exact or receive from any employee any contribution, or make or take any deduction from the earnings of any employee, either directly or indirectly, to cover the whole or any part of the cost of compensation under this division. Violation of this subdivision is a misdemeanor."

## B.    *The FAAAA*

In 1978, Congress "'determin[ed] that "maximum reliance on competitive market forces"' would favor lower airline fares and better airline service, and it enacted the Airline Deregulation Act [(ADA)]. *Morales v. Trans World Airlines, Inc*., 504 U.S. 374, 378 (1992) [(*Morales*)] (quoting 49 U.S.C.App. § 1302(a)(4) (1988 ed.)); see 92 Stat. 1705.)  In order to 'ensure that the States would not undo federal deregulation with regulation of their own,' that Act 'included a pre-emption provision' that said 'no State . . . shall enact or enforce any law . . . relating to rates, routes, or services of any air carrier.' *Morales*, *supra*, at 378; 49 U.S.C.App. § 1305(a)(1) (1988 ed.)." (*Rowe v. New Hampshire Motor Transport Assn.* (2008) 552 U.S. 364, 367-368 (*Rowe*).)

In 1980, Congress deregulated trucking.  (See Motor Carrier Act of 1980, 94 Stat. 793.)  In 1994, Congress similarly sought to preempt state trucking regulation through the FAAAA.  In doing so, it modeled its preemption provision on the ADA as follows:  "[A] State . . . may not enact or enforce a law . . . related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." (49 U.S.C. § 14501(c)(1); see *Rowe*, *supra*, at pp. 367-368.)

Because the relevant preemption language of the ADA and FAAAA are so closely related, the United States Supreme Court has relied on its ADA jurisprudence to interpret the scope of FAAAA preemption. (*Rowe*, *supra*, 552 U.S. at p. 370.)


## C.    *U.S. Supreme Court ADA and FAAAA Preemption Decisions*

The United States Supreme Court first considered the scope of ADA preemption in *Morales*, *supra*, 504 U.S. 374.  There, the issue before the court was whether the ADA preempted "Air Travel Industry Enforcement Guidelines" (guidelines) adopted by state attorneys general that "contain[ed] detailed standards governing the content and format of airline advertising, the awarding of premiums to regular customers (so-called 'frequent flyers'), and the payment of compensation to passengers who voluntarily yield their seats on overbooked flights." (*Id*. at p. 379.)  These guidelines purported not to "'create any

24

new laws or regulations,'" but instead claimed to "'explain in detail how existing state laws apply to air fare advertising and frequent flyer programs.'" (*Ibid*.)

The court concluded that the guidelines were preempted by the ADA. It explained that the ordinary meaning of "relating to" is broad—"'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with,' Black's Law Dictionary 1158 (5th ed. 1979)—and the words thus express a broad preemptive purpose." (*Morales*, *supra*, 504 U.S. at p. 383.) Accordingly, "[s]tate enforcement actions *having a connection with or reference to* airline 'rates, routes, or services' are pre-empted under 49 U.S.C.App. § 1305(a)(1)." (*Morales*, *supra*, at p. 384, italics added.) Applying this standard, the court concluded that the guidelines "quite obviously" related to fares. (*Morales*, *supra*, 504 U.S. at p. 387.) It explained: "One cannot avoid the conclusion that . . . the guidelines 'relate to' airline rates. In its terms, every one of the guidelines enumerated above bears a 'reference to' airfares. [Citation.] And, collectively, the guidelines establish binding requirements as to how tickets may be marketed if they are to be sold at given prices." (*Id*. at p. 388.) Moreover, "beyond the guidelines' express reference to fares, it is clear as an economic matter that state restrictions on fare advertising have the forbidden significant effect upon fares" because "[a]dvertising 'serves to inform the public of the . . . prices of products and services, and thus performs an indispensable role in the allocation of resources.'" (*Id*. at p. 388.) Thus, the court held the fare advertising provisions of the guidelines were preempted by the ADA. (*Id*. at p. 391.)

The Supreme Court applied its preemptions analysis to the FAAAA in *Rowe*, *supra*, 552 U.S. 364, 368. There, it considered whether the FAAAA preempted two provisions of Maine law that regulated the delivery of tobacco to customers within the state. (*Id*. at p. 367.) The court noted that in *Morales*, it had described Congress' goal in enacting the ADA as "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces,' thereby stimulating 'efficiency, innovation, and low prices,' as well as 'variety' and 'quality.'" (*Rowe*, *supra*, at p. 371.) Thus, *Morales* had held "(1) that '[s]tate enforcement actions *having a connection with,*

25

*or reference to*' carrier '"rates, routes, or services" are pre-empted' [citation] (emphasis added); (2) that such pre-emption may occur even if a state law's effect on rates, routes or services 'is only indirect' [citation]; (3) that, in respect to pre-emption, it makes no difference whether a state law is 'consistent' or 'inconsistent' with federal regulation [citation]; and (4) that pre-emption occurs at least where state laws have a 'significant impact' related to Congress' deregulatory and pre-emption-related objectives [citation]." (*Rowe*, *supra*, at pp. 370-371.) *Morales* further said that "federal law might not pre-empt state laws that affect fares in only a 'tenuous, remote, or peripheral . . . manner.'" (*Rowe*, *supra*, at p. 371.) However, the court noted, *Morales* "did not say where, or how, 'it would be appropriate to draw the line,' for the state law before it did not 'present a borderline question.'" (*Ibid.*)

The court held that the Maine tobacco law was preempted by the FAAAA because it "has a 'significant' and adverse 'impact' in respect to the federal Act's ability to achieve its pre-emption-related objectives." (*Rowe*, *supra*, 552 U.S. at pp. 371-372.) It explained: "The Solicitor General and the carrier associations claim (and Maine does not deny) that the law will require carriers to offer a system of services that the market does not now provide (and which the carriers would prefer not to offer). And even were that not so, the law would freeze into place services that carriers might prefer to discontinue in the future. The Maine law thereby produces the very effect that the federal law sought to avoid, namely, a State's direct substitution of its own governmental commands for 'competitive market forces' in determining (to a significant degree) the services that motor carriers will provide." (*Id.* at p. 372.)

The court concluded: "The provision . . . requires the carrier to check each shipment for certain markings and to compare it against the Maine attorney general's list of proscribed shippers. And it thereby directly regulates a significant aspect of the motor carrier's package pickup and delivery service. In this way it creates the kind of state-mandated regulation that the federal Act pre-empts. [¶] . . . [T]o interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations. That state regulatory patchwork is

26

inconsistent with Congress' major legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." (*Rowe*, *supra*, 552 U.S. at p. 373.)

### D. *Dillingham*

The Supreme Court considered whether state labor laws were preempted by the federal Employee Retirement Income Security Act of 1974 (ERISA) in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.* (1997) 519 U.S. 316 (*Dillingham*). There, a California law required contractors on public works projects to pay their workers the prevailing wage in the projects' locale. An exception to that requirement permitted a contractor to pay lower wages to workers participating in approved apprenticeship programs. Before the court in *Dillingham* was whether ERISA's preemption provision—which provided that ERISA shall supersede state laws "insofar as they . . . relate[d] to any employee benefit plan" (29 U.S.C. § 1144(a))—preempted California's prevailing wage law to the extent that the wage law prohibited paying an apprentice wage to an apprentice trained in an unapproved program.

The court said that a law "'relate[s] to'" a covered benefit plan for purposes of section 514, subdivision (a) """"if it [1] has a connection with or [2] reference to such a plan."""" (*Dillingham*, *supra*, 519 U.S. at p. 324.) It explained that where a State's law "acts immediately and exclusively upon ERISA plans, . . . or where the existence of ERISA plans is essential to the law's operation, . . . that 'reference' will result in pre-emption." (*Id*. at p. 325.) Further, a law that does not refer to ERISA plans "may yet be pre-empted if it has a 'connection with' ERISA plans." (*Ibid*.) "[T]o determine whether a state law has the forbidden connection, we look both to 'the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive,' [citation], as well as to the nature of the effect of the state law on ERISA plans, [citation]." (*Ibid*.) In doing so, "[a]s is always the case in our pre-emption jurisprudence, where 'federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the "assumption that the historic police powers of the States were not

27

to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" [Citations.]" (*Ibid*.)

The court concluded that the prevailing wage law did not explicitly "make reference to" ERISA plans, and thus it was not barred by the second prong of the test. (*Dillingham*, *supra*, 519 U.S. at p. 325.) The law also did not "ha[ve] a 'connection with'" ERISA plans, and thus was not barred by the first prong of the test, because it had only an "'indirect economic influence'" on such plans. (*Id*. at p. 329.) The court explained: "The wages to be paid on public works projects and the substantive standards to be applied to apprenticeship training programs are . . . quite remote from the areas with which ERISA is expressly concerned—'"reporting, disclosure, fiduciary responsibility, and the like."' [*New York State Conf. of Blue Cross & Blue Shield Plans v.*] *Travelers* [*Ins. Co.* (1995) 514 U.S. 645,] 661 (quoting *Shaw* [*v. Delta Air Lines* (1983)] 463 U.S. [85,] 98). A reading of § 514(a) resulting in the pre-emption of traditionally state-regulated substantive law in those areas where ERISA has nothing to say would be 'unsettling,' *Travelers*, 514 U.S., at 665." (*Dillingham*, *supra*, at pp. 331-332.)

The court continued: "[T]he apprenticeship portion of the prevailing wage statute does not bind ERISA plans to anything. No apprenticeship program is required by California law to meet California's standards. See *Southern Cal. ABC*, 4 Cal.4th, at 428. If a contractor chooses to hire apprentices for a public works project, it need not hire them from an approved program (although if it does not, it must pay these apprentices journeyman wages). So, apprenticeship programs that have not gained [California Apprenticeship Council] approval may still supply public works contractors with apprentices. Unapproved apprenticeship programs also may supply apprentices to private contractors. The effect of § 1777.5 on ERISA apprenticeship programs, therefore, is merely to provide some measure of economic incentive to comport with the State's requirements, at least to the extent that those programs seek to provide apprentices who can work on public works projects at a lower wage. . . . It cannot be gainsaid that § 1777.5 has the effect of encouraging apprenticeship programs—including ERISA plans—to meet the standards set out by California, but it has not been demonstrated here

28

that the added inducement created by the wage break available on state public works projects is tantamount to a compulsion upon apprenticeship programs." (*Dillingham*, *supra*, 519 U.S. at pp. 332-333, fns. omitted.)

The court concluded: "The prevailing wage statute alters the incentives, but does not dictate the choices, facing ERISA plans. In this regard, it is 'no different from myriad state laws in areas traditionally subject to local regulation, which Congress could not possibly have intended to eliminate.' *Travelers*, 514 U.S., at 668. We could not hold pre-empted a state law in an area of traditional state regulation based on so tenuous a relation without doing grave violence to our presumption that Congress intended nothing of the sort. We thus conclude that California's prevailing wage laws and apprenticeship standards do not have a 'connection with,' and therefore do not 'relate to,' ERISA plans." (*Dillingham*, *supra*, 519 U.S. at p. 334.)

> E.      *Lower Federal Court Decisions Addressing the Effect of FAAAA Preemption on State Labor Laws*

Following *Morales*, *Rowe*, and *Dillingham*, the lower federal courts have struggled with the scope of FAAAA preemption, particularly as applied to state labor laws. A case illustrating this struggle is *Californians for Safe and Competitive Dump Truck Transp. v. Mendonca, supra,* 152 F.3d 1184 (*Mendonca*). There, the Ninth Circuit considered whether the FAAAA preempted enforcement of California's Prevailing Wage Law (CPWL). (Lab. Code, §§ 1770-1180.) Under that law, contractors and subcontractors awarded public works contracts were required to pay their workers "'"not less than the general prevailing rate . . . for work of a similar character in the locality in which the public work is performed,"'" and contractors who failed to pay prevailing wages were assessed penalties. (*Mendonca*, *supra*, at p. 1186.) Plaintiffs, public works contractors who provided transportation on publicly-funded projects in California, failed to pay their workers prevailing wages and were assessed penalties by California enforcement authorities. Thereafter, plaintiffs filed suit seeking declaratory and

29

injunctive relief, claiming that enforcement of the CPWL violated the Supremacy Clause of the United States Constitution because the FAAAA preempted the CPWL. (*Ibid*.)

The Ninth Circuit held that the FAAAA did not preempt the CPWL. It began by noting that state laws dealing with matters traditionally within a state's police powers, such as prevailing wage laws, should not be found to be preempted unless Congress's intent to do so was clear. (*Mendonca*, *supra*, 152 F.3d at p. 1187.) Here, Congress had expressed no such clear intent. The court explained: "While CPWL in a certain sense is 'related to' [plaintiffs'] prices, routes and services, we hold that the effect is no more than indirect, remote, and tenuous. *See Dillingham*, 117 S.Ct. at 842. We do not believe that CPWL frustrates the purpose of deregulation by acutely interfering with the forces of competition. *See Travelers*, 514 U.S. at 668. Nor can it be said, borrowing from Justice Scalia's concurrence in *Dillingham*, that CPWL falls into the 'field of laws' regulating prices, routes, or services. *See Dillingham*, 117 S.Ct. at 843. Accordingly, we hold that CPWL is not 'related to' [plaintiffs'] prices, routes, and services within the meaning of the FAAA Act's preemption clause." (*Mendonca*, *supra*, at p. 1189, fn. omitted.)

The court reached a similar conclusion in *Air Transport Asso. of America v. City and County of San Francisco* (9th Cir. 2001) 266 F.3d 1064 (*Air Transport*). There, a provision of San Francisco's administrative code required city contractors to provide employee benefits to the domestic partners of employees, whether married or registered with a government entity. Plaintiffs United Airlines, Federal Express, and others (airlines) urged that the city ordinance was preempted by the ADA. (*Id.* at p. 1068.) Specifically, the airlines urged that there was a forbidden connection with routes and services because if they did not comply with the ordinance, they would be unable to lease property at San Francisco International Airport (SFO). The court disagreed: "What the Airlines are truly complaining about are free market forces and their own competitive decisions. Whatever leverage the City has in its negotiations over the Airlines is created by the market conditions that were allowed to blossom through the passage of the ADA. The ADA allows air carriers to make their own decisions about where to fly and how many resources to devote to each route and service. In this deregulated environment,

30

airlines can decide whether or not to make large economic investments at the San Francisco airport. Now, as the Airlines claim, 'because of competitive demands and the economic commitments made to respond to those demands,' they are committed to staying at San Francisco. That economic decision may mean the Airlines will have to agree to abide by the Ordinance's nondiscrimination requirements as a 'cost' of maintaining their leases at SFO. That San Francisco may have bargaining power because of the Airlines' competitive decisions does not, however, thereby disable San Francisco from enforcing its nondiscrimination Ordinance; it is not using that power to force the Airlines to adopt or change their prices, routes or services—the prerequisite for ADA preemption. [¶] . . .

"Indeed, the costs of providing the domestic partner employment benefits at issue here—the only costs the Airlines complained about—are a small, if not inconsequential, fraction of the Airlines' costs of flying through SFO. . . . The Airlines could comply with the Ordinance's requirements by reducing or eliminating these benefits altogether, thereby avoiding any additional costs. Moreover, some of the plaintiffs have actually begun extending employment benefits to their employees' domestic partners on a nationwide basis during the pendency of this appeal, even though they were not obligated to do so under the Ordinance. This further evidences that the costs of providing these benefits are not enough to compel the Airlines to change their routes and services. [Citation.] Hypothetically, there might be some contract term the City could demand whose costs would be so high that it would compel the Airlines to change their prices, routes or services. [Citation.] The nondiscrimination provisions at issue here, however, do not approach that level." (*Air Transport*, *supra*, 266 F.3d at pp. 1074-1075, fn. omitted.)

The court reached a contrary result in *Dilts v. Penske Logistics*, *LLC* (S.D.Cal. 2011) 819 F.Supp.2d 1109 (*Dilts*). There, defendant Penske hired hourly employees to provide warehouse and warehouse management services to Whirlpool Corporation in California. Penske employees received customer orders, caused appliances to be manufactured outside California and then delivered to Whirlpool warehouses, inventoried

31

the appliances, loaded appliances onto trucks, and then delivered appliances to customers. (*Id*. at pp. 1111-1112.)  Because Penske "expected" employees to take meal breaks, it automatically deducted 30 minutes from its employees' work time "'without inquiry into whether the employee was actually provided with a timely 30-minute uninterrupted and duty-free meal period.'" (*Id*. at p. 1112.)  Plaintiffs, hourly appliance delivery drivers and installers assigned to Penske's Whirlpool account, sued, alleging violations of several provisions of the California Labor Code as well as unfair business practices in violation of Business and Professions Code section 17200.  Penske moved for summary judgment, contending that all of plaintiffs' causes of action were preempted by the FAAAA.  (*Id*. at p. 1113.)

The district court granted summary judgment, finding that plaintiffs' claims were preempted by the FAAAA.  It explained that although state law need not directly regulate motor carriers to be preempted, a law will be preempted if its effect is such that motor carriers "would have to offer different services than what the market would otherwise dictate or 'freeze into place services that carriers might prefer to discontinue in the future.'  See *Rowe*, 552 U.S. at 371-72 ('the effect of the regulation is that carriers will have to offer tobacco delivery services that differ significantly from those that, in the absence of the regulation, the market might dictate')." (*Dilts*, *supra*, 819 F.Supp.2d at p. 1118.)  The court noted, however, that neither *Morales* nor *Rowe* indicate "exactly where, or how, it would be appropriate to draw the line between a significant impact and a tenuous effect because neither of the state laws at issue in those cases presented a 'borderline question.'  *Morales*, 504 U.S. at 390; *Rowe*, 552 U.S. at 371, 375-76." (*Dilts*, *supra*, at p. 1118.)

The court continued:  "In a very recent decision, the Ninth Circuit examined a 'borderline case' of federal preemption under the FAAA Act.  See *Am. Trucking Assoc., Inc. v. City of Los Angeles*, 660 F.3d 384 (9th Cir. 2011).  *American Trucking* acknowledged that '[t]he waters are murkier . . . when a State does not directly regulate (or even specifically reference) rates, routes, or services.'  *Id*. at 396.  Recognizing that preemption by the FAAA Act may occur even when the effect on rates, routes, and

services is only indirect, *American Trucking* sets out the proper inquiry in 'borderline cases' where the effect on prices, routes, and services may be close to merely tenuous or remote: 'the proper inquiry is whether the provision, directly or indirectly, "binds the . . . carrier to a particular price, route or service and thereby interferes with competitive market forces within the . . . industry."' *Id*. (citing *Air Transport Ass'n of Am. v. City & Cnty. of San Francisco*, 266 F.3d 1064, 1071 (9th Cir. 2001)). *Air Transport* considered whether a city ordinance relating to equal protection of domestic partners had an effect on the routes of airlines, finding that the ordinance was not preempted because it 'cannot be said to compel or bind the Airlines to a particular route or service,' even though it might require airlines to increase their rates or cease operating at San Francisco Airport. *Air Transport*, 266 F.3d at 1072-74. In spite of the ordinance, air carriers could still 'make their own decisions about where to fly and how many resources to devote to each route and service.' *Id*. at 1074.

"Thus, *American Trucking* and *Air Transport* make clear that the Court's task here is to determine whether these laws, which do not directly target the motor carrier industry, 'bind' Penske's prices, routes, or services and thereby 'interfere with competitive market forces within the . . . industry.' Although it is a close question, the Court finds that they do.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Penske argues these M & RB [meal and rest break] laws have a significant effect on the routes of a motor carrier. The fairly rigid meal and break requirements impact the types and lengths of routes that are feasible. 'The five stops Plaintiffs insist Penske should have ensured at specified times in a 12-hour workday would thus have necessarily forced drivers to alter their routes daily while searching out an appropriate place to exit the highway, [and] locating stopping places that safely and lawfully accommodate their vehicles.' While the laws do not strictly bind Penske's drivers *to* one particular route, they have the same effect by depriving them of the ability to take any route that does not offer adequate locations for stopping, or by forcing them to take shorter or fewer routes. In essence, the laws bind motor carriers to a smaller set of possible routes.

33

"Additionally, the M & RB laws have a significant impact on Penske's services. The parties both agree that 'scheduling off-duty meal periods for drivers "would require one or two less deliveries per day" per driver.' Penske states further that the mandated duty-free 10-minute rest periods every four hours (preferably in the middle of the four-hour period) and duty-free 30-minute meal breaks every five hours reduce driver flexibility, interfere with customer service, and, 'by virtue of simple mathematics,' reduce the amount of on-duty work time allowable to drivers and thus reduce the amount and level of service Penske can offer its customers without increasing its workforce and investment in equipment. (*Id.*) Plaintiffs do not contest these facts.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Here, the length and timing of meal and rest breaks seems directly and significantly related to such things as the frequency and scheduling of transportation. Both parties agree that the M & RB laws impact the number of routes each driver/installer may go on each day, and Plaintiffs do not oppose Penske's argument that the laws impact the types of roads their drivers/installers may take and the amount of time it takes them to reach their destination from the warehouse. The connection to 'schedules, origins, . . . and destinations' is far from tenuous. While Penske has not shown that the M & RB laws would prevent them from serving certain markets, the laws bind Penske to a schedule and frequency of routes that ensures many off-duty breaks at specific times throughout the workday in such a way that would 'interfere with competitive market forces within the . . . industry.'

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[T]o allow California to insist exactly when and for exactly how long carriers provide breaks for their employees would allow other States to do the same, and to do so differently. 'And to interpret the federal law to permit these, and similar, state requirements could easily lead to a patchwork of state service-determining laws, rules, and regulations.' *Id.* Thus, the Court finds state regulation of details significantly impacting the routes or services of the carrier's transportation itself preempted by the

FAAA Act." (*Dilts*, *supra*, 819 F.Supp.2d at pp. 1118-1120, internal record citations omitted.)

### F.      *Fitz-Gerald v. SkyWest Airlines, Inc.*

Division Six of this district considered the effect of ADA preemption on state wage and hour laws in *Fitz-Gerald v. SkyWest Airlines, Inc.* (2007) 155 Cal.App.4th 411 (*Fitz-Gerald*).  There, plaintiffs were flight attendants who sued their employer for unpaid minimum wages, unpaid meal and rest breaks, overtime, waiting time penalties, and violations of the UCL.  (*Id*. at p. 415.)  In the main portion of the opinion, the court concluded that plaintiffs' claims were preempted by the federal Railway Labor Act (45 U.S.C. § 151 et seq.).  In the alternative, the court considered whether plaintiffs' claims were also preempted by the ADA.  The court held that the ADA did not preempt plaintiffs' causes of action for violations of state labor law, explaining:  "SkyWest . . . cites no authority that the ADA preempts actions to enforce state minimum wage laws or state laws governing meal/rest breaks.  Although the ADA has been broadly interpreted as preempting state 'enforcement actions having a connection with, or reflect to, airline "rates, routes, or services,"' it has its limits.  (*Morales*[, *supra*,] 504 U.S. at p. 384.)  If the rule was otherwise, 'any string of contingencies is sufficient to establish a connection with price, route or service, [and] there will be no end to ADA preemption.  [Citations.]' (*Air Transport v. City and County of San Francisco* (N.D.Cal. 1998) 992 F.Supp. 1149, 1183.)"  (*Fitz-Gerald*, *supra*, at p. 423.)  The court reached a different result, however, with regard to plaintiffs' UCL cause of action, which apparently was based on the underlying Labor Code violations.  In that regard, it concluded without analysis that "[b]ased on [*Morales* and *American Airlines, Inc. v. Wolens* (1995) 513 U.S. 219], we conclude that the ADA bars the fifth cause of action for relief under the California Unfair Business Practices Act."  (*Fitz-Gerald*, *supra*, at p. 423.)[6]

---

[6]      Division Five of this district rejected *Fitz-Gerald's* analysis in part in *People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2011) 195 Cal.App.4th 765, review granted August 10, 2011, S194388 (*Pac Anchor*).  In *Pac Anchor*, the State of California

*G.    Analysis*

As we have said, the FAAAA preempts state laws that "relate[]" to a "price, route, or service of any motor carrier." (49 U.S.C. § 14501(c)(1); *Rowe*, *supra*, 552 U.S. at pp. 367-368.) Taken together, the cases discussed above hold that a state law "relates" to federal law if it has "'a connection with'" or "'reference to'" the subject of the federal law. Preemption may occur even if the state law's effect "'is only indirect,'" but there is no preemption if that effect is only "'tenuous, remote, or peripheral.'" (*Rowe*, *supra*, 552 U.S. at pp. 370-371.) Generally applicable state labor laws are not preempted if they do not "*acutely* interfere[] with the forces of competition" or prevent carriers from making "their own decisions about [routes] and how many resources to devote to each route and service." (*Mendonca*, *supra*, 152 F.3d at p. 1189; *Air Transport*, *supra*, 266 F.3d at p. 1074.) However, if the state labor laws are such that they "bind" the motor carrier's

---

brought a UCL cause of action based on defendant's alleged misclassification of its workers as independent contractors. As a result of the classification, defendant did not obtain workers' compensation insurance, withhold state disability insurance or income taxes, pay unemployment insurance on behalf of drivers, insure payment of the state minimum wage, or provide its drivers with written statements of hours and pay. (*Id*. at p. 774.) Like the *Fitz-Gerald* court, Division Five concluded that the state's action to enforce the state statutory obligations under the Labor Code "is not related to Pac Anchor's prices, routes, or services, even though it may remotely affect the prices, routes, and services that the motor carrier provides." (*Id*. at p. 774.) Such a remote affect, it said, "is too tenuous for preemption under the FAAAA." (*Ibid*.) The court disagreed with *Fitz-Gerald*, however, that all state unfair business practices statutes are preempted by the ADA and FAAAA: "Where a cause of action is based on allegations of unlawful violations of the state's labor and unemployment insurance laws, we see no reason to find preemption merely because the pleading raised these issues under the UCL, as opposed to separately stated causes of action. We respectfully disagree with *Fitz-Gerald's* contrary conclusion as to preemption of causes of action under the UCL." (*Id*. at p. 773.)

*Pac Anchor* is currently under review by the California Supreme Court, where the question presented is as follows: "Is an action under the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.) that is based on a trucking company's alleged violation of state labor and insurance laws 'related to the price, route, or service' of the company and, therefore, preempted by the Federal Aviation Administration Authorization Act of 1994 (49 U.S.C. § 14501)?"

prices, routes, or services, they interfere with competitive market forces and are preempted by the FAAAA. (*Dilts*, *supra*, 819 F.Supp.2d at pp. 1117-1118.)

Here, both plaintiffs and RWA appear to agree that the California laws at issue do not "reference" motor carrier prices, routes, or services within the meaning of *Morales*, *Rowe*, and *Dillingham*. That is plainly true—section 3751 is a law of general application that does not apply exclusively to motor carriers. The law therefore does not "act[] immediately and exclusively upon" motor carriers. Further, "the existence of" motor carriers is not "essential to the law's operation." (*Dillingham*, *supra*, 519 U.S. at p. 325.) Therefore, section 3751 does not "reference" motor carrier prices, routes, or services.

We turn therefore to the second part of the analysis—whether section 3751 and *Albillo* have a "connection with" motor carrier prices, routes, or services within the meaning of *Morales*, *Rowe*, and *Dillingham*. For the following reasons, they do not.

First, as in *Dillingham*, the laws at issue concern the exercise of the state's "historic police powers." (*Dillingham*, *supra*, 519 U.S. at p. 325.) "Examples of historic police powers include '[c]hild labor laws, minimum and other wage laws, laws affecting occupational health and safety, *and workmen's compensation laws . . . .*' (*De Canas v. Bica* (1976) 424 U.S. 351, 356-357.) 'States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.' (*Ibid.*)" (*Farmer Brothers Coffee v. Workers' Comp. Appeals Bd*. (2005) 133 Cal.App.4th 533, 538-539, italics added.) Under these circumstances, there can be no federal preemption """"unless that was the clear and manifest purpose of Congress."""" (*Dillingham*, *supra*, at p. 325.)

Moreover, as in *Dillingham*—and as distinct from *Morales* and *Rowe*—the workers' compensation laws at issue have only an indirect economic influence on motor carriers. That is, unlike the statutes at issue in *Morales* and *Rowe*, the workers' compensation laws at issue here neither "establish binding requirements" as to how the motor carriers' products may be marketed (*Morales*, *supra*, 504 U.S. at p. 388), nor "freeze into place services that carriers might prefer to discontinue in the future" (*Rowe*, *supra*, 552 U.S. at p. 372). Indeed, as in *Dillingham*, the laws at issue do not "bind

37

[motor carriers] to anything." (*Dillingham*, *supra*, 519 U.S. at p. 332.)  Specifically, they do not require California motor carriers to purchase workers' compensation insurance for their independent contractors.  They merely provide that if motor carriers *choose* to purchase such workers' compensation insurance, the motor carriers cannot pass the costs of that insurance on to their independent contractors.  Whether motor carriers purchase workers' compensation insurance is entirely their own decision—state law does not force their hand in this regard.  As in *Dillingham*, state law may "alter[] the incentives, but does not dictate the choices" facing motor carriers.  (*Id.* at p. 334.)

RWA urges that section 3751 has a direct connection with prices because it transfers "an operating expense from the contract trucker to the motor carrier, . . . necessarily undermin[ing] the pricing decision the motor carrier made when determining what to charge its customers."  This has the effect, RWA contends, of "substituting a governmental policy for the forces of free market competition" and, thus, is preempted by the FAAAA.  We do not agree.  The crux of RWA's preemption argument is that the effect of California law, as interpreted by *Albillo*, is to increase its operating expenses and, thus, decrease its profitability.  As we have said, however, California law does not require RWA to purchase workers' compensation insurance for its independent contractors.  To the extent that motor carriers incur workers' compensation insurance expenses on behalf of their independent contractors, it is because they *choose* to purchase workers' compensation insurance—not because state law mandates that they do so.

Moreover, on the present record there is no evidence that section 3751 increases RWA's operating expenses.  Under California law, employers such as RWA may choose to forgo workers' compensation insurance for their independent contractors—thus exposing themselves to """"the wider range of damages potentially available in tort"""" (*Albillo*, *supra*, 114 Cal.App.4th at p. 199)—or they may purchase workers' compensation insurance, which eliminates a worker's tort recovery in most cases.  There is before us no evidence that purchasing workers' compensation insurance increased RWA's operating expenses over what they would have been had RWA chosen not to purchase that insurance.  Indeed, RWA presumably chose to purchase workers'

38

compensation insurance because it believed that doing so would *decrease*, not increase, its expenses.

RWA also contends that *Albillo* affects RWA's services because RWA "may or may not be a less attractive place for a contract trucker to work" and "[t]he environment in which the contract trucker works . . . has a direct effect on the quality of RWA's service to its customers." RWA's argument seems to suggest a direct connection between the services RWA offers its drivers and the services it offers its customers. RWA cites no authority for this proposition, nor are we aware of any. In any event, we reject this contention for the same reason we rejected the suggestion of an effect on price—nothing in California law requires RWA to provide workers' compensation insurance for its independent contractors.

Finally, RWA cites *Fitz-Gerald* for the proposition that the FAAAA preempts all UCL causes of action, even if the underlying labor laws on which the UCL causes of action are based are not themselves preempted. Although *Fitz-Gerald* appears to so hold, it does not explain or justify its conclusion other than by a brief reference to *Morales* and *Wolens*. (*Fitz-Gerald*, *supra*, 155 Cal.App.4th at p. 423.) Thus, like the Court of Appeal in *Pac Anchor*, *supra*, 195 Cal.App.4th 765 (see fn. 5, *ante*), we respectfully disagree with *Fitz-Gerald* and conclude that where a cause of action is based on allegations of unlawful violations of the state's labor laws, there is no reason to find preemption merely because the pleading raised these issues under the UCL, rather than directly under the provisions of the Labor Code alleged to have been violated.

For all of these reasons, we conclude that section 3751, as interpreted by *Albillo*, is not preempted by the FAAAA. The trial court did not err in so concluding.

## III. THE TRIAL COURT ERRED IN AWARDING PLAINTIFFS PREJUDGMENT INTEREST UNDER CIVIL CODE SECTION 3287

The trial court granted plaintiffs prejudgment interest for the period December 12, 1993, through May 2012. RWA contends that the trial court did not exercise its discretionary power in making this award, but rather awarded prejudgment interest on the

39

basis of Civil Code section 3287 and section 3751. RWA contends this was error; citing *M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.* (2012) 202 Cal.App.4th 1509, RWA urges that because a monetary award under the UCL is restitution, not damages, it does not support prejudgment interest.

Plaintiffs disagree. They assert that the trial court awarded prejudgment interest under its equitable powers; alternatively, they urge that a restitution award supports an award of prejudgment interest under Civil Code section 3287.

For the reasons stated below, we conclude Civil Code section 3287 does not authorize prejudgment interest on an award of restitution under the UCL. (*M&F Fishing*, *supra*, 202 Cal.App.4th at p. 1528.) Because we are affirming the restitution award under the second cause of action, we remand the matter for the trial court to determine whether to award prejudgment interest as to that claim under its equitable powers.

### A. The Trial Court's Award of Prejudgment Interest

The trial court awarded plaintiffs prejudgment interest as to the second cause of action, as follows: "As to Plaintiff's Second Cause of Action, the Court previously held that RWA is liable under Plaintiffs' Second Cause of Action related to the workers' compensation insurance coverage charges . . . . [¶] . . . The Court finds that Restitution should be Ordered as the harm to Plaintiff and the certified class outweighs any utility of RWA's policies and practices in unlawfully deducting the cost of workers' compensation insurance coverage from the compensation of Plaintiff and the certified class members. [Citation.] Pursuant to Business and Professions Code §§ 17200, 17203, 17535 and pursuant to the equitable powers of this Court, RWA is Ordered to restore to Plaintiff and the Class all funds RWA retained by means of the unfair and unlawful business acts and practices alleged herein. . . .

"The parties argued whether prejudgment interest should be awarded. [¶] RWA argues that prejudgment interest should not be awarded on the amount of money RWA unlawfully withheld from Plaintiff and the Class for workers' compensation insurance coverage until, at least, the date on which the *Albillo* case was published. The Court

40

finds that *Albillo* does not indicate that its decision should not be applied retroactively and *Albillo* did not create new law, but only interpreted workers' compensation laws that have existed for many years prior to the decision being rendered.

"The trial Court awards Plaintiff and the certified class members prejudgment interest at 10% [per] annum. The trial court is authorized to award prejudgment interest under California Civil Code § 3287, based upon RWA's violation of Business and Professions Code §§ 17200, et seq., using as a predicate RWA's violation of California Labor Code § 3751. Civil Code § 3287(a) states: 'Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day[.]' The California Supreme Court long ago held that Civil Code § 3287 provides for prejudgment interest. *See, e.g., Mass v. Board of Education* (1964) 61 Cal.2d 312.

"Prejudgment interest under Civil Code § 3287 is awardable when a defendant violates a statute. *See, Tripp v. Swoap* (1976) 17 Cal.3d 671, 681-682 (*overruled on other grounds in Frink v. Prod* (1982) 31 Cal.3d 166, 180). In *Tripp*, the California Supreme [Court] upheld an award of prejudgment interest in a case based on a statutory violation. Thus, prejudgment interest may be awarded for a violation of Business and Professions Code §§ 17200, et seq., that is predicated on a violation of Labor Code § 3751; defendants that violate those statutes are not shielded against an award of prejudgment interest under Civil Code § 3287.

"The courts have explained that prejudgment interest is intended to put a plaintiff back in the same position the plaintiff was in before money was unlawfully taken from the plaintiff. [Citation.] If plaintiff is not put in the same position as before having money unlawfully taken, then the wrongdoer '"benefits from denying liability and continuing to litigate, while he retains the use of money to which the plaintiff is entitled, and the plaintiff is deprived of the benefit he should have derived from an immediate recovery."' [Citation.] This could not be more true than in the case at bar, that has been

41

litigated for over 10 years, all while RWA benefited from the use of the money that it unlawfully took from Plaintiff and the certified class members.

". . . Plaintiff and each class member is entitled to interest on the amount of money unlawfully deducted from their compensation for the cost of workers' compensation insurance coverage and all amounts of restitution in this case pursuant to Business & Professions Code § 17203. *See, Ballard v. Equifax Check Servs., Inc.* (E.D.Cal. 2001) 158 F.Supp.2d 1163, 1176-1177; *Irwin v. Mascott* (N.D.Cal. 2000) 112 F.Supp.2d 937, 956.)

"The parties stipulated that the interest calculated on the total deduction set forth . . . above up to the date of September 26, 2011 is $233,360. The parties agree that the total deductions from the class members' compensation for workers' compensation insurance coverage is $143,377.20, plus interest, in the total amount of $366,737.20.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Defendant is ordered to restore to the Plaintiff and the Class, pursuant to this and further orders regarding restitution procedures, on Plaintiff's Second Cause of Action for unlawfully charging the Plaintiff and the Class the cost of workers' compensation insurance in violation of Labor Code § 3751, the principal amount of $143,377.20, and prejudgment interest through September 26, 2011 in the amount of $233,360. Prejudgment interest on the principal amount continues to accrue at the rate of 10% simple interest until [the] entry of judgment. . . ." (Paragraph numbering & internal record citation omitted.)

### B.    *Civil Code Section 3287*

Civil Code section 3287 provides: "(a) Every person who is entitled to recover *damages certain*, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor from paying the debt. . . ." (Italics added.)

42

In *M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.*, *supra*, 202 Cal.App.4th 1509, the court held that section 3287 does not authorize prejudgment interest on an award of restitution under the UCL. The court explained: "Civil Code section 3287, subdivision (a) also is inapplicable because it governs recovery of *damages*. . . . As we noted *ante*, under the UCL a plaintiff is entitled to injunctive relief and restitution, but *not* damages. (See *Korea Supply* [*Co. v. Lockheed Martin Corp*. (2003)] 29 Cal.4th [1134,] 1144; see also *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 179.)" (*M&F Fishing, Inc.*, *supra*, at p. 1538.) The court said, however, that although section 3287 did not authorize prejudgment interest under these circumstances, the trial court had inherent discretionary authority to award such interest, and it remanded the case to allow the trial court to exercise its discretion. (*Id.* at p. 1539.)

We are not persuaded by plaintiffs' argument that the trial court in the present case awarded prejudgment interest pursuant to *both* section 3287 *and* its equitable powers. To the contrary, the statement of decision suggests that the award of prejudgment interest on the second cause of action was based solely on section 3287. We therefore remand the matter for the trial court to exercise its discretion with regard to an award of prejudgment interest on the second cause of action.

## PLAINTIFFS' CROSS-APPEAL

Plaintiffs contend in their cross-appeal that the trial court should have ordered RWA to restore to the drivers *all* of the money it collected for liability insurance, not merely the additional administrative fee RWA charged. According to plaintiffs, RWA "offset its own insurance costs by unlawfully taking money from the truck drivers. RWA should be disgorged of all money it unlawfully took from the truck drivers for liability, physical damage, and cargo insurance, pursuant to RWA's unlawful scheme of transacting insurance without a license under Insurance Code § 1623 and failing to properly disclose premiums in policy documents under Insurance Code § 381. Otherwise, RWA benefits from its unlawful acts."

43

For the reasons discussed above, RWA did not violate the law by charging plaintiffs for the costs of liability insurance.  Accordingly, the trial court correctly declined to order RWA to disgorge the money charged plaintiffs for that insurance.

## DISPOSITION

We reverse the trial court's award of restitution and prejudgment interest as to the first cause of action for unlawfully transacting insurance in violation of the Insurance Code.  We affirm the trial court's award of restitution as to the second cause of action for unlawful reimbursement of workers' compensation insurance, and we remand the matter for the trial court to exercise its discretion with regard to prejudgment interest in accordance with the views expressed in this opinion.  The parties are to bear their own costs on appeal.

**CERTIFIED FOR PUBLICATION**

SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

44